**BERLAND'S, INC., OF TULSA, a corporation, Plaintiff in Error,**

v.

**NORTHSIDE VILLAGE SHOPPING CENTER, INC., a corporation, and Aetna Life Insurance Company, a corporation, Defendants in Error.**

No. 39702.

Supreme Court of Oklahoma.

Jan. 22, 1963.

As Corrected Feb. 11, 1963.

J. C. Pinkerton, James C. Pinkerton, Tulsa, for plaintiff in error.

Covington & Gibbon, A. M. Covington, Tulsa, for defendants in error.

DAVISON, Justice.

This is an appeal by Berland's, Inc., of Tulsa (plaintiff below and herein referred to as Berland) from a judgment in favor of Northside Village Shopping Center, Inc., and Aetna Life Insurance Company (defendants below) denying Berland's petition and prayer for cancellation of a written lease covering store space in a shopping center in Tulsa, Oklahoma.

Generally, Berland's petition alleges that under a written lease dated September 6, 1956, Northside leased to Berland a store space 60' by 50' in a building in a proposed shopping center to be built by Northside in accordance with a certain plot plan attached to the lease; that Berland relied upon the provisions of the lease and upon Section 24 thereof relative to parking areas and construction and maintenance thereof; that Berland took possession of the store space on February 15, 1958, before the shopping center was completed and that the parking areas were completed under a revised plot plan, which Berland never approved, and which defeated the object of the lease; and offering to restore everything of value, if any, received by Berland; by reason thereof the lease should be rescinded and canceled and the parties restored to status quo.

Defendants' answer was a general denial and an admission of the contractual status of the parties and that Aetna held a mortgage upon the shopping center; a denial of change in the parking arrangements, and alleging that Berland was informed of a different parking plan and was estopped to complain; and that the final parking plan was beneficial to Berland.

In connection with its judgment denying cancellation of the lease, the trial court made findings of fact and conclusions of law. In general the court found that after construction was started Northside revised the parking whereby some parking in the northwest area was eliminated and a small parking space was added in other areas, and changes were made in the number of south entrances; that Berland was informed of the changes and did not formally approve, but did take possession of the leased store space; that the revised parking area was 4.53 times the shopping (store) space and admittedly adequate for the needs of shoppers; that the reduction of the northwest parking did not reduce the number of pedestrian shoppers passing Berland's store; and concludes the breach of the lease agreement was not so substantial

or fundamental as to defeat the object of the contract and had been waived by Berland.

Berland presents its contentions under a number of related propositions. We will determine the appeal under the general proposition that the judgment is contrary to the clear weight of the evidence and is contrary to the applicable law.

■ A suit for rescission and cancellation of a lease agreement is an action of equitable cognizance, and is governed by principles of equity. Coal Oil and Gas Company v. Styron, Okl., 303 P.2d 965.

■ In Liberty Plan Co. v. Francis T. Smith Lumber Co., Okl., 360 P.2d 500, we said:

"In actions of equitable cognizance this Court will examine the entire record and weigh the evidence, but unless the judgment rendered is clearly against the weight of the evidence it will not be disturbed on appeal."

The record reflects that in the summer or fall of 1956, Northside began the promotion of a shopping center on a tract of land in Tulsa and had a plot plan prepared, reflecting the layout of the buildings and parking areas. This will be referred to as the original plan. Access was by entrances from 36th Street on the south, from Hartford on the east (which ran through the east part of the tract,) and Garrison Street ran south into the northeast portion of the tract. Extending east and west across the approximate center of the tract was a proposed long building (1040 feet by about 120 feet) which was divided into two sections by a north and south mall located about midway between the east and west ends. This two section building was divided into numerous shop and store spaces. Directly south of and opposite the mall was the outline of a large department store building (160 feet in width and 200 feet in depth) and designated "Froug's Dept. Store." This original plan reflected that the area surrounding these buildings was for vehicle parking and had individual parking spaces drawn thereon. The parking areas directly opposite the ends of the long two section building are small. The parking area on the north side was appreciably larger than that on the south side.

The original plan also reflects a contemplated development of a narrow strip of land east of Hartford as a Medical Center and Bank Area with some parking. However there was never any development of this area.

Berland and Northside then entered into the lease sought to be canceled in this action. The lease is dated September 6, 1956, but executed by Berland on December 3, 1956, for a term of 15 years beginning when possession was taken, after completion of the building, with option for 2 five year extensions, at a rental of $500 per month or 5% of gross sales, whichever was greater. The original plot plan was made a part of the lease. At the request of Berland Section 24 was inserted in the lease and provides:

"Lessor covenants and agrees, for itself, its successors and assigns, that the area indicated as parking areas on the plan hereto attached and made a part hereof shall be appropriated, set apart and surfaced with a good grade of hard-surface material, for the parking of motor vehicles by customers, agents, and employees of Tenants, sub-tenants and concessionaires, occupying buildings in said shopping center, and to maintain said parking area for parking purposes exclusively throughout the term of this lease. Lessor hereby grants to the customers, agents and employees of Lessee and to the customers, agents and employees of sub-tenants and concessionaires of Lessee, a non-exclusive license to use said parking area for the parking of motor vehicles during the term of this lease, jointly and in common with other customers, agents, employees and other invitees and licensees of lessor and those of all future owners, tenants and occupants of land in the shopping

center to whom similar parking rights shall from time to time be given. Lessee agrees that if a specific space is designated for employee parking by the Lessors, Lessee will require its employees to park in the said space."

The store space is a 60 foot by 50 foot area (marked on the original plan) located in the southeast corner of the west section of the long east and west store building, so that it has an east front and door on the mall and a south front and door that is separated by a 30 foot walk from the north front and door of Froug's Department Store. The value and importance of the relative location of Berland's leased space to Froug's Department Store, and to the north parking area as depicted on the original plan, constitutes the main basis for Berland's contention that the lower court erred in denying cancellation of the lease.

During the construction of the shopping center the city authorities required fewer entrances from 36th Street on the south, and a small tract of land was acquired at the southwest corner, and a new entrance was made from the west in that area. Early in 1957 Northside employed a different engineering firm and a revised parking plan was made. This revised parking plan is dated June, 1957. Under this plan a large part of the north parking area was eliminated and was designated on the revised plan as "Future Parking if Needed." The eliminated parking constitutes a large majority of the area lying north of the mall and the west section of the long shop building. The testimony and photo exhibits reflect that this reduction in parking eliminated the expense and necessity of removing a high hill and further that in bringing the remaining limited parking to grade level in that area a high, steep shale bank was left to form the north boundary of such parking.

As the shopping center neared completion, Aetna, to whom the permanent mortgage loan was to be assigned by Finance Corporation, requested that lessees in the center approve the parking as reflected by the revised plan. On January 15, 1958, Finance Corporation, before closing the permanent mortgage loan, wrote Berland in St. Louis asking that it give written approval that the parking shown on the revised plot met "the requirements" of the lease. Berland, by letter dated January 27, stated that the parking was less than that shown on the plot plan attached to the lease and that " * * * we can not agree at this time to accept the lesser parking space. After the premises are open and if we find that the parking space is adequate we may waive the parking requirement and accept the lesser parking space." On February 7, 1958, Finance Corporation again made written request for Berland's approval. On February 12 Berland wrote Northside that Berland had to "make certain that there is a sufficient amount of parking in our area according to our lease." On February 15 Berland took possession and on February 19, 1958, wrote Northside that " * * * it is our contention that the parking area should be built according to the requirements of our lease. I am sorry to have to take this stand, but we feel it is important to our business." Several other letters of the same tenor were exchanged. The formal opening of the center took place March 13, 14, 15, 1958. Later there were conferences between the attorneys for Berland and Northside and the suit was filed December 31, 1958.

It is clear and is admitted that there was a breach of the lease in that the north parking area was not developed in the area and dimensions as set forth on the original plan that was attached to and made a part of the lease. It was admitted by witnesses on both sides that the ratio of parking space to store space was considered sufficient on the basis of comparative square footage. Berland contends, however, that as to it, the breach constituted a failure of consideration in a material respect so as to defeat the object of the lease agreement and was of such importance that the

lease would not have been executed if such default had been expected or contemplated.

Berland's principal witnesses were: its president since 1932, with many years experience in leasing and selecting store locations; the executive vice-president of a chain of stores with merchandising problems similar to those of Berland, with responsibility for selecting and negotiating for store locations; a specialist in chain store operation in connection with choice of store locations in shopping centers; and a local real estate man with knowledge and experience in shopping trends and locations in shopping centers. A summary of their testimony was that Berland was in the business of chain store retail selling of seasonal merchandise consisting principally of women's footwear and accessories that requires quick turn over; that the type of retailing did not create traffic shopping and it was essential that a location be acquired in close proximity to a large retail establishment which would draw large numbers of shoppers, who would necessarily or normally pass and see or be attracted to the display windows of Berland; that under the original plan the north parking was the primary and majority portion of the parking and that the north side was the front of the center, and that such situation would attract and influence shoppers entering the center to park on the north side; and that under such circumstances, as shown on the original plan, the store space leased to Berland was a prime location for the operation of its type of retail business, since it was located on the mall between the north parking and Froug's Department Store on the south and shoppers would pass the location when going to and from Froug's.

These witnesses further testified that the revised plan of June, 1957, and the layout of the parking when completed was such a radical and material change from the original plan, so that the south side became the front and the primary parking area, and the north side the rear of the shopping center; that sufficient parking was necessary to the success of a shopping center as a whole, but that the location of the parking was more essential and important to Berland's location and its type of merchandising; that the north parking, in addition to being much smaller, was not attractive or inviting to customer shopping and presented the appearance of a service area and few people park there; and that the effect of the revised plan was to destroy the value of the leased location to Berland. An engineer estimated that the revised plan reduced the north parking area by half, from about 900 to about 450 parking spaces, and the local real estate authority estimated the parking area as completed created a greater reduction.

Berland's president further testified that the lease and original plot was studied and considered and that it was at his insistence that Sec. 24 (supra) was inserted in the lease, and that Berland would not have signed the lease if the revised plan had been submitted with the proposed lease or had it been anticipated that the revised plan would be substituted. In this connection the executive vice-president of the similar retail chain stores also testified that the original plan had been submitted to him and after seeing the aerial maps had selected the store space in question, but Berland was first in making the lease, and further that he would not want the location under the revised plan. There was testimony that few shoppers parked in the north area or used the mall.

In rebutting Berland's evidence the president of Northside, who had developed a number of shopping centers in Tulsa, testified that the city required fewer entrances from 36th Street and that a different engineering firm was employed and the revised plan was prepared that made several changes in the traffic flow and that 5 acres was secured for an additional entrance and parking on the west; that the majority of the traffic comes from 36th Street; that both of the plans provided for 1800 parking spaces and was sufficient parking and the north parking was never

full and it would be impractical to enlarge the north parking area; that he still considered the north side as a front and the center had a double front; that shoppers picked their place to park and he had no control where they park; and that he reasonably intended to fulfill the obligations of the lease. A representative of the engineering firm stated the revised plan provided adequate parking and the extension of the north parking would not now increase parking in that area and would be impractical to remove the hill because of the cost; and that his firm, at the time of its employment, sought to adapt and make the parking according to the outline of the grading as it then existed. The president of Froug's, after testifying generally as to his approval thereof, stated on cross-examination that in the center, as it existed, the south side was the "front of the parking" and the north side was the rear and that the front door of Froug's was designed to face north and under the original plan either side of the center could be the front; that he was satisfied with the ratio of parking to store space. The tenor of other testimony of this witness is that Froug's was satisfied with the change and that the success of the center was not dependent on location of parking but on promotion and advertising.

From our consideration of the testimony and the exhibits, including plots and aerial photos, it is obvious that the adverse parties rely to a great extent on different theories and grounds to support the respective positions. Berland claims the breach destroyed the relationship of the location to and with parking and with a large retail establishment on which it relied to promote sales of its merchandise. Defendants urge the ratio of parking to store space was admittedly adequate. However this was not a complete answer to Berland's evidence that the revised plan rendered the store location undesirable, since sufficient parking under the revised plan would not of itself continue the desirable status of the location that was shown to ex-

ist under the original plan. The fact that Sec. 24, requiring Northside to complete the parking as reflected in the original plan, was inserted in the lease at Berland's insistence and at a time when there was no controversy, strongly supports Berland's position that such development of the parking was an essential element of the lease and an important inducement to Berland to enter into the lease. In this respect Northside did not perform and Berland did not get what it was to receive under the lease.

Furthermore we think it is important and material to the disposition of this appeal that it stands uncontroverted that Berland would not have signed the lease if the revised plan had been submitted with the proposed lease. This was the testimony of Berland's president and, as shown, has some support in the testimony of an officer of another similar concern that was initially interested in leasing the location.

In Davis v. Gwaltney, Okl., 291 P.2d 820, 823, we stated the applicable law.

"By virtue of the provisions of 15 O.S.1951 § 233, a party to a contract may rescind the same if through the fault of the party as to whom he rescinds, the consideration for his obligation fails in whole or in part, or if such consideration, before it is rendered to him, fails in a material respect, from any cause. We have held that a partial failure of performance, is ground for the rescission of a contract, when such failure defeats the object of the contract, or when it concerns a matter of such importance that the contract would not have been made if default in that particular had been expected or contemplated. G. A. Nichols, Inc., v. Hainey, 190 Okl. 242, 122 P.2d 809, 139 A.L.R. 967; Wallace v. Smith, 205 Okl. 557, 240 P.2d 799."

It is our conclusion that the evidence reflects that the breach of the contract was material and a failure of performance that defeated the object of the lease and further that it is an uncontroverted fact that the lease would not have been

made if the breach had been expected or contemplated.

Defendants argue in support of the judgment that Berland has shown no loss of profits by reason of the breach. Berland's store manager did testify that later sales were less than at the beginning of the lease term. However, under the circumstances, we regard this as not being material. This is an action for cancellation of the lease and not for damages. Also it appears Berland would be handicapped in showing loss of profits for the reason that this was a store in a new location and a new shopping center and there was no previous business experience at that location to use for comparison purposes. In Dieffenbach v. McIntyre, 208 Okl. 163, 254 P.2d 346, we said that loss of anticipated profits from a business was a proper element of damages only when the business is an established one.

■ Berland also contends that the finding of the trial court that Berland had waived the breach has no support in the evidence. We agree with this contention. As shown above Berland both before and after taking possession refused to accept the parking or waive its objection that the parking did not comply with the terms of the lease. Defendants argue that the acts of Berland in taking possession and paying the rent were a waiver of the breach. The acts of Berland must be viewed in the light of the exchange of letters and as such must be considered as conditional or with reservations. The rent was paid under protest. If the action was for rescission because of fraud then acceptance of benefits after discovery of the fraud would create an estoppel or waiver to assert a right to cancel the lease. The action is for rescission based on a breach constituting a failure of consideration. In such an action Berland cannot be said to have waived the right to contend Northside had failed to carry out the lease terms and seek rescission, simply because Berland had received some benefits or done some act implying an intention to abide by the lease or to af-

firm the lease, where, as here, Berland has offered to restore everything of value received by it under the contract. See Davis v. Gwaltney, supra, in which we stated:

"* * * To so argue would in effect be to argue that one party to a contract could not complain of the failure of the other party to carry out the contract unless he, too, had refused to carry out the contract, or at least had done nothing indicating an intention on his part to be bound by the contract. Such is so obviously not the law that we deem further discussion thereof unnecessary."

It is our conclusion that the judgment of the trial court was clearly against the weight of the evidence and that the judgment should have rescinded and canceled the lease.

Reversed and remanded with directions to render judgment in accordance with the views herein expressed.