**MERCURY INVESTMENT COMPANY,
an Oklahoma corporation,
Appellant-Respondent,**

v.

**F.W. WOOLWORTH COMPANY, a
foreign corporation,
Appellee-Petitioner.**

**No. 59609.**

Supreme Court of Oklahoma.

May 7, 1985.

Rehearing Denied Oct. 8, 1985.

Charles A. Whitebook, Merl A. Whitebook, Rebecca Adams, Messrs. Whitebook, Holtz, Gaddis & Smolen, Tulsa, for appellant-respondent.

John Henry Rule, Messrs. Gable & Gotwals, Tulsa, for appellee-petitioner.

OPALA, Justice.

The issue on certiorari is whether in a landlord's suit to terminate a shopping center lease for failure of consideration—based on the alleged breach of an implied covenant diligently to operate the business so as to trigger the percentage rental provisions—the trial court erred in granting summary judgment for the tenant. We

answer in the negative and vacate the Court of Appeals' opinion that reaches a contrary conclusion.

## FACTS

In 1958 Mercury Investment Co. [Mercury] built a multi-tenant shopping center in Sand Springs, Oklahoma and leased space to F.W. Woolworth Co. [Woolworth] in early 1959. Their agreement, printed on a form drafted by Woolworth, provided for an original term of fifteen years and allowed five successive options, each to extend for five years. Woolworth agreed to pay Mercury an "annual minimum rent" of $19,350 for the first fourteen years and $17,425 annually for the remainder of the term. The lease also called for additional rent in the form of a percentage of gross receipts. The percentage rent was to be triggered by annual sales in excess of $387,000 for the first fourteen years and $348,500 thereafter.[1] These sales' levels were never reached, and hence no percentage rent was ever paid.

Late in 1981 Mercury brought a termination suit for failure of consideration based on Woolworth's alleged breach of an *implied* covenant diligently to operate its business in such a manner as to generate percentage rentals and to attract customers to the shopping center for the benefit of the other tenants as well.

Woolworth sought summary judgment in its favor on two grounds: (a) the landlord's claim relied on inadmissible parol evidence of oral negotiations which occurred prior to the execution of the lease, and (b) the action was barred by the statute of limitations. On review of the summary judgment for Woolworth, the Court of Appeals reversed and remanded the cause for further proceedings. We now reinstate the trial court's summary judgment.

---

1. The lease provided that, in addition to the annual minimum rent, should the sum of "(a) 5% of the first $425,000, and (b) 4% of the next $875,000, and (c) 3% of the remainder of said sales (i.e. over $1,300,000) exceed the annual rent payable for the same period covered by such statement, Tenant agrees that it will forth-

## I

### THE COURT OF APPEALS' DECISION

The Court of Appeals held that: (a) because of the interdependent nature of the relationships created among all the tenants by the shopping center's leasing plan, the lease agreement on its face indicates that Woolworth, as an "anchor tenant", owes the obligation diligently to pursue its operations in a manner to "secure a fair and adequate return to the Lessor"; (b) the "asserted covenant" does not come within the parol evidence rule because it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (c) questions of fact remain as to (1) the manner in which Woolworth presently operates its business, and (2) the adequacy of the minimum monthly payment; and (d) in determining whether the "minimum monthly payments" were intended as adequate rental, the court may look into the circumstances surrounding the inception of and performance under the lease agreement.

## II

### THE PERTINENT LEASE PROVISIONS

Mercury contends the face of the lease demonstrates that Woolworth was intended to be an "anchor tenant" of the shopping center and its function was to generate traffic, to attract patronage to the shopping center for the mutual benefit of all retail tenants and, as a consequence, to generate substantial and adequate percentage rentals, all as anticipated by the parties to the lease. This is gleaned in part, Mercury asserts, from a common merchandising plan, as shown by the lease terms that provide for a common parking area and

---

with pay to the Landlord, an additional rent due hereunder, a sum equivalent to such excess". Based on the $19,350 rate, the annual rent would be exceeded when the gross receipts are above $397,000 and, under the $17,425 rate, when they are above $348,000.

contemplate the presence of three other principal tenants—i.e., a supermarket, a drug store and a clothing store. If the three tenants were not in operation by a certain date, Woolworth could exercise its option of terminating the lease or of having its rent abated until the other tenants were doing business in their respective locations. The lease also contained a restrictive covenant in favor of Woolworth which prohibited occupancy of the shopping center by another "variety" or "junior" department store. According to the Court of Appeals, the physical relationship of the tenants and the "interdependent nature" of the leasing plan demonstrate that the parties contemplated Woolworth would operate in such a manner "as to satisfy its obvious function" in the shopping center.

Woolworth, on the other hand, contends that the terms of the lease agreement are clear and explicit as to its obligations. The contract, Woolworth argues, required it to pay a minimum base rental, with additional percentage rentals due *only* if sales

reached a certain volume. Furthermore, Woolworth asserts that the lease agreement *expressly excluded* any warranty by Woolworth with respect to the volume of sales it would generate upon the premises.[2] This, along with the other provisions,[3] Woolworth argues, negates any obligation on its part to operate its business under some amorphous standard of "commercial prudence". Additionally, Woolworth contends that the parties specifically contemplated that Woolworth was not to be compelled to operate its business at all, but could vacate the premises, cease its operations and simply continue paying the stated rental for the remainder of the term.[4]

## III

### RULES FOR CONSTRUING A LEASE AGREEMENT

 The object of Mercury's suit was to secure a judicially-approved termination of the lease.[5] A landlord's suit to declare a

---

**2.** Article 5A of the lease agreement provided: "... The Tenant makes no representation or warranty as to the sales which it expects to make in the demised premises ..."

**3.** Article 26 of the lease agreement provided in part:
"This lease ... is and shall be considered to be the only agreement between the parties hereto; all negotiations and oral agreements acceptable to both parties are included herein. The Landlord by the execution hereof acknowledges full performance to the date hereof of all covenants required to be performed by the Tenant under all prior leases, contracts and agreements of every kind and nature whatsoever affecting the demised premises or the property of which the demised premises are a part.
The Landlord further releases the Tenant from the performance of any and all obligations of every kind and nature whatsoever under said leases, contracts and agreements (except such obligations as are expressly included in the herein lease), all of which are hereby cancelled and terminated."

**4.** Article 5A of the lease agreement provided in part:
"... Should the Tenant at any time vacate its store in the demised premises ... then ... anything in this lease to the contrary notwithstanding, it is hereby mutually agreed that the Tenant shall pay to the Landlord annually during the remainder of the term of this lease,

in addition to the annual rent ... a sum equal to one-third ($\frac{1}{3}$) of the additional rent (*if any*) paid by the Tenant to the Landlord pursuant to the provisions of this article for the three (3) calender years next preceding the vacating of said store ..." [emphasis added]
Mercury, viewing this provision in a different light, asserts that implicit therein is the understanding by the parties that the "annual minimum rent" was neither substantial nor adequate, for the space and other facilities provided to Woolworth by the shopping center.

**5.** The statute, 15 O.S.1981 § 233(2), refers to the relief of termination for failure of consideration as "rescission". The terms of § 233(2) provide:
"A party to a contract may *rescind* the same in the following cases only:
 \* \* \* \* \* \*
2. If through the fault of the party as to whom he rescinds, the *consideration for his obligation fails in whole or in part.* \* \* \*"
[emphasis added]
In its strict legal sense "termination" or "cancellation" allows the promisor to be relieved from treating as valid and subsisting so much of the obligation as remains unperformed, whereas "rescission" calls for restoration of the parties to their former position. *F. & M. Drilling Co. v. M. & T. Oil Co.,* 192 Okl. 372, 137 P.2d 575, 577 [1943]. *The landlord in this case sued for termination under the terms of 15 O.S.1981 § 233(2).*

lease terminated is one of equitable cognizance. It is governed by the norms of chancery jurisprudence.[6] No new rights are intended to be conferred or taken away. The suit's purpose is to enforce those already in force. A lease is in the nature of a contract and is controlled by principles of contract law.[7]

A contract must be considered as a whole so as to give effect to all its provisions without narrowly concentrating upon some clause or language taken out of context.[8] The language in a contract is given its plain and ordinary meaning unless some technical term is used in a manner meant to convey a specific technical concept.[9] The court must interpret a contract so as to give effect to the intent of the parties at the time the contract was formed.[10] The parol evidence rule provides that unless fraud or mistake is involved pre-contract negotiations and oral discussions are merged into, and superseded by, the terms of the executed written agreement.[11] While parol testimony cannot vary, modify or contradict the terms of the instrument, it is admissible to explain the meaning of words when there is a latent ambiguity in the written text of the agreement.[12] Thus the practical construction of an agreement, as evidenced by the acts and conduct of the parties, is available only in the event of an ambiguity. *But where a*

*contract is complete in itself and, as viewed in its entirety, is unambiguous, its language is the only legitimate evidence of what the parties intended.* The intention of the parties cannot be determined from the surrounding circumstances, but must be gathered from a four-corners' examination of the contractual instrument in question.[13]

## IV

### BASIS FOR IMPLYING A COVENANT IN LEASE AGREEMENT

Mercury's failure-of-consideration argument is based on (1) an inference from a four-corners' examination of the lease that Woolworth promised diligently to conduct its business so as to generate percentage rentals—a condition that was within the contemplation of the parties when they entered into the agreement but which they failed to include within the express terms of the lease and (2) after-developed facts that show consideration failed during the lease term because of Woolworth's lack of diligence to operate its business in a commercially prudent manner. In short, the asserted failure of consideration is sought to be rested on a two-part test: (a) an implied covenant to be inferred from the terms of the agreement[14] and (b) ex-

**6.** *Jones v. Goldberger,* Okl., 323 P.2d 344, 346–347 [1958]; *Berland's Inc. of Tulsa v. Northside Village Shopping Center, Inc.,* Okl., 378 P.2d 860, 862 [1963]; *Snow v. Winn,* Okl., 607 P.2d 678, 680 [1980].

**7.** *Ferguson v. Dist.Ct. of Oklahoma County,* Okl., 544 P.2d 498, 499 [1975]; *Sublett v. City of Tulsa,* Okl., 405 P.2d 185, 200 [1965]; *Howard v. Manning,* 79 Okl. 165, 192 P. 358 [1920].

**8.** 15 O.S.1981 § 157.

**9.** 15 O.S.1981 § 160.

**10.** 15 O.S.1981 § 152.

**11.** 15 O.S.1981 §§ 137 and 155. Under the terms of § 137, referred to generally as the parol evidence rule, testimonial evidence may be admissible to vary or contradict the terms of a written contract when fraud, accident or mistake is relied upon for relief from the binding effect of a contract. *Snow v. Winn, supra* note

6 at 682; *Dewberry v. Yellow Manufacturing Acceptance Corp.,* Okl., 396 P.2d 522, 524 [1964]; *Lone Star Gas Co. v. Oakman,* Okl., 283 P.2d 810, 813–814 [1955].

**12.** *Ollie v. Rainbolt,* Okl., 669 P.2d 275, 279 [1983].

**13.** *Snow v. Winn, supra* note 6 at 682; *Sunray Packing Co. v. Wilson,* Okl., 268 P.2d 264, 267 [1954]; *Daniel v. Pappas,* 93 Okl. 165, 220 P. 355, 357 [1923]. While an ambiguous instrument may be explained by parol evidence, nothing inconsistent with it may be added or taken away. *Anderson, Clayton & Co. v. First American Bank of Erick,* Okl., 614 P.2d 1091, 1095 [1980].

**14.** Covenants are of two types—express or implied. Express covenants are created by the words in an agreement. Implied covenants are generally grouped into two categories: implied-in-fact and implied-in-law. *A covenant implied-*

trinsic evidence to show that the implied covenant was breached.

As a general rule implied covenants are not favored in the law.[15] This view owes its force to the presumption that when the parties have entered into a written agreement that embodies their obligations, they have expressed all of the conditions by which they intend to be bound.[16] Courts are reluctant to imply covenants where the obligations sought to be imposed on the contracting parties are not expressed in the written text.[17] Absent illegality, contracting parties are free to bargain as they see fit. When the bargained-for agreement is reduced to writing, a court may not make a new contract for the parties or rewrite the existing contract.[18]

This does not mean that covenants may never be implied from written agreements.[19] Because the courts are reluctant to tamper with the parties' written

contract,[20] certain conditions are imposed before a covenant will be inferred from the language used. There are many decisions, mostly from other jurisdictions, laying down well defined rules that govern implied covenants in lease contracts, where as here, there is a provision for a guaranteed minimum rent and a further provision for a percentage rental.[21] The general rule enunciated in these decisions is that (1) the obligation must arise from the presumed intention of the parties as gathered from the language used in the written instrument itself or it must appear from the contract as a whole that the obligation is indispensable in order to give effect to the intent of the parties; and (2) it must have been so clearly within the contemplation of the parties that they deemed it unnecessary to express it.

Recognized as a corollary to the general rule governing covenants that could be inferred from a written instrument is the principle that when the rental reserved in a

*in-law*—i.e., a constructive covenant—is presumed from the relation of the parties and the object to be achieved by the agreement. Public policy supplies the basis of such covenant without regard to the intention of the parties. In other words, it is but a legal duty imposed by law and created otherwise than by assent and without any words or conduct that are interpreted as promissory. Public policy extends to freedom of contract insofar as private dealing is restricted by law for the good of the community. *Cameron & Henderson v. Franks,* 199 Okl. 143, 184 P.2d 965, 972 [1947]. A *covenant implied-in-fact,* in contrast, is deemed to be more akin to the nature of an express covenant because it is raised by inference from words used in the agreement to effect the intention of the parties. See 3 Corbin on Contracts § 562, p. 286 [1960]; 1 Tiffany, The Law of Real Property § 89, p. 316 [1936]; 1 Friedman on Leases § 6.9, pp. 197–199 [1983].

15. *Walgreen Arizona Drug Co. v. Plaza Center Corp.,* 132 Ariz. 512, 647 P.2d 643, 646 [Ariz.App. 1982]; *Keystone Square v. Marsh Supermarkets, Inc.,* 459 N.E.2d 420, 423 [Ind.App.1984]; *Sheets v. Selden,* 74 U.S. 416, 19 L.Ed. 166 [1868]; *Bobenal Investment Co. v. Giant Super Markets,* 79 Mich.App. 31, 260 N.W.2d 915, 919 [1978]; *Smith v. Phlegar,* 73 Ariz. 11, 236 P.2d 749, 754 [1951].

16. *Palm v. Mortgage Investment Co. of El Paso,* 229 S.W.2d 869, 873 [Tex.Civ.App.1950]; *Walgreen Arizona Drug Co. v. Plaza Center Corp.,*

*supra* note 15 at 646; *Cousins Investment Co. v. Hastings Clothing Co.,* 45 Cal.App.2d 141, 113 P.2d 878, 879 [1941].

17. *Walgreen Arizona Drug Co. v. Plaza Center Corp., supra* note 15 at 646; *Cousins Investment Co. v. Hastings Clothing Co., supra* note 16 at 880–881.

18. *Welch v. Montgomery,* 201 Okl. 289, 205 P.2d 288, 291 [1949].

19. A contract consists not only of the agreements which the parties have expressed in words, but also of obligations that are reasonably implied. *Wright v. Fidelity & Deposit Co. of Maryland,* 176 Okl. 274, 54 P.2d 1084, 1087 [1936].

20. *Freeport Sulphur Co. v. American Sulphur Royalty Co.,* 6 S.W.2d 1039, 1041 [Tex.1928]; *Cousins Investment Co. v. Hastings Clothing Co., supra* note 16.

21. *Cousins Investment Co. v. Hastings Clothing Co., supra* note 16; *Masciotra v. Harlow,* 105 Cal.App.2d 376, 233 P.2d 586, 590 [Cal.App. 1951]; *Percoff v. Solomon,* 259 Ala. 482, 67 So.2d 31, 40 [1953]; *Palm v. Mortgage Investment Co. of El Paso, supra* note 16; *Kroger Company v. Bonny Corporation,* 134 Ga.App. 834, 216 S.E.2d 341, 344 [1975]; *Bobenal Investment v. Giant Super Markets, supra* note 15 at 919.

lease is based upon a percentage of the gross receipts of a business and a guaranteed substantial minimum rent, a covenant would not be implied; but if the minimum rental is so low as to be nominal, or where there is no minimum rental, then a covenant might be implied.[22] We followed these principles in *Monte Corp. v. Stephens*.[23] *Stephens* was an action to recover damages for breach of a lease that provided both for a guaranteed minimum rental and a rental based on a percentage of gross receipts. We refused to imply a covenant that would have required the tenant to occupy the premises and generate percentage rentals throughout the term of the lease because the lease called for a "substantial, adequate minimum rent".

## V

## NO COVENANT MAY BE INFERRED FROM THE LEASE AGREEMENT

### A

Keeping in mind the rules so far articulated, we find nothing in the language employed in the lease to support the conclusion that there was an implied covenant by which Woolworth could be required to conduct its business in what in some caselaw is referred to as a "commercially prudent manner". Nor is there anything in the nature of the transaction to justify a finding that the implied covenant was indispensable to effectuate the intention of the parties. An examination of the agreement

shows that its terms are clear, definite and unambiguous.

 Under the agreed rental terms Woolworth was obligated to pay a "minimum base rental" and additional percentage *only if* sales passed a certain threshold level. The lease does not contain any express covenant by which Woolworth promises to so operate its business as to generate percentage rentals and to accelerate customer traffic flow for the benefit of the other tenants. The express provisions of the lease agreement clearly negate the covenant sought to be implied against Woolworth. In Article 5A of the lease [24] Woolworth expressly declined to guarantee any level of sales expected to be generated by its business upon the leased premises. An express covenant on a given subject-matter excludes the possibility of an implied covenant of a different or contradictory nature.[25] Furthermore, the lease terms found in Article 26 [26] make it clear that the contract embodied all the pre-contract negotiations and contained all the obligations that were to be performed by Woolworth. This is further borne out by the explicit provisions that govern liability after vacation of the premises during the lease term.[27] In the event of pre-termination abandonment Woolworth must pay the base rent for the remainder of the term and one-third of the percentage rentals, *"if any"*, that had been generated during the three-year period last preceding the vacation.

22. (a) Where the minimum guaranteed rent was found to be "substantial", some courts have refused to imply a covenant. *Percoff v. Solomon, supra* note 21; *Jenkins v. Rose's 5, 10 & 25¢ Stores, Inc.,* 213 N.C. 606, 197 S.E. 174 [1938]; *Kretch v. Stark,* 193 N.E.2d 307 [Ct.Com.Pl.Ohio 1962]; *Monte Corp. v. Stephens, infra* note 23; *Dickey v. Philadelphia Minit-Man Corp.,* 377 Pa. 549, 105 A.2d 580 [1954].

(b) Where a lease provides no minimum rent or a truly nominal rent, the covenant is generally implied. *Sinclair Refining Co. v. Davis,* 47 Ga.App. 601, 171 S.E. 150 [1933]; *Seggebruch v. Stosor,* 33 N.E.2d 159 [Ill.App.1941]; *Prins v. Van der Vlugt,* 215 Or. 682, 337 P.2d 787 [Ore.1959]; *Marvin Drug Co. v. Couch,* 134 S.W.2d 356 [Tex.Civ.App.1939].

See also 1 Friedman on Leases § 6.901, pp. 200–204 [1983]; 3 Corbin on Contracts § 568 [1960]; Kline, Percentage Leases: May Lessee Vacate Premises?, 19 Clev.St.L.R. 612 [Sept. 1970].

23. Okl., 324 P.2d 538 [1958] (syllabus).

24. See pertinent provisions of Article 5A in footnote 2 *supra.*

25. *Williams v. Safeway Stores, Inc.,* 198 Kan. 331, 424 P.2d 541, 548 [Kan.1967].

26. See pertinent provisions of Article 26 in footnote 3 *supra.*

27. See pertinent provisions of Article 5A in footnote 4 *supra.*

**532**

Furthermore, the conduct Woolworth would be required to pursue in order to satisfy the asserted implied covenant is articulable by Mercury in most amorphous terms. The court would have great difficulty in determining whether Woolworth's breach had in fact occurred.[28] Enforcement of the implied covenant that is sought to be imposed would violate the time-honored principle that a covenant may not be implied unless it is so clearly within the contemplation of the parties that they deemed it unnecessary to express it. In short, a covenant calling for a performance the parties themselves cannot define in clear and certain terms will not be implied.

The lease is cast in the form of a highly sophisticated document employing clear, precise and unambiguous language that covers a myriad of details regarding the parties' relationship as landlord vis-a-vis tenant. In the face of its comprehensive terms, this court is powerless to add a covenant requiring Woolworth to generate sales that would subject it to liability for percentage rentals. The parties could have inserted an explicit termination clause to be triggered by continued failure of Woolworth to reach some agreed level of gross receipts within a specified period. To now imply the covenant pressed for by Mercury would be to rewrite the parties' agreement. We should be loath to hold Woolworth to any greater level of business productivity than Mercury itself was able to exact from a willing tenant.

### B

Neither can we infer from our four-corners' examination of the lease that—at the time it was set—the guaranteed minimum rent was so low as to be merely nominal and thus warrant an implied covenant requiring Woolworth to generate sales which create a liability for percentage rentals. *No* basis exists for this assumption. The lease under consideration was not a renewal of a prior lease. There was here no established period of past experience by which the parties could be guided in determining the minimum rental. Woolworth was entering upon a new venture, and neither party was capable of accurately projecting the potential gross receipts from the business to be conducted on the premises. Under these circumstances, it can only be concluded that the parties considered the stipulated minimum rent to be in itself fair and adequate, and any additional sum was in the nature of a bonus Woolworth was to pay if its sales were to rise above the stipulated figures.

In short, from a four-corners' examination of the lease we find nothing to warrant a conclusion that the base rental, *sans* any part of the percentage rental, would result in a failure of consideration. Consideration may be said to have failed when consideration *that was bargained for* does not pass to the promisor, either in whole or in part.[29] This is not the case here. Neither is there any latent ambiguity that would authorize parol testimony to elucidate the meaning of the words used or the intention of the parties from circumstances that surrounded the transaction.

### C

In the absence of fraud, accident or mistake, oral testimony cannot be used to vary or contradict the terms of a written contract.[30] When parol evidence is sought to be admitted to show failure of consideration, the law draws a distinction between the terms "failure of consideration" and "want of consideration".

Failure of consideration implies that a bargained-for consideration, originally in existence and good, has since become worthless or has ceased to exist or been

---

**28.** *Weil v. Ann Lewis Shops,* 281 S.W.2d 651, 656 [Tex.Civ.App.1955]; *Palm v. Mortgage Investment Co., supra* note 16; *Food Fair Stores, Inc. v. Blumberg,* 234 Md. 521, 200 A.2d 166, 174–175 [Md.App.1964].

**29.** *Necho Coal Co. v. Denise Coal Co.,* 387 Pa. 567, 128 A.2d 771, 772 [Pa.1957].

**30.** *Strickland v. Hetherington,* Okl., 353 P.2d 138, 140 [1960]; see footnote 12 *supra.*

extinguished, partially or entirely.[31] The term has also been defined as the neglect, refusal, or failure of one of the parties to perform or furnish the consideration agreed upon.[32]

 The phrase "want or absence of consideration" has been defined as a total lack of any valid consideration for a contract.[33] A plea of want of consideration amounts to a contention that the instrument did not become a valid obligation in the first place.[34]

 When consideration is sought to be challenged by proof dehors the instrument, the parol evidence bar recognizes some exceptions. These are:

1. In the *absence of a recital of consideration* which the parties *intend to be contractual,* parol or extrinsic evidence is admissible to show the true consideration for a contract and that the consideration was greater or less than, or different from, that expressed in the writing.[35]

2. Parol or extrinsic evidence is also generally held to be admissible, at least as between the parties themselves, to show that there was an *absence or want of* consideration. Such evidence does not contradict any particular term of the writing but attacks its existence as a contract and is therefore admissible.[36]

3. Where the statement in the contract as to the consideration is *more than a recital* of fact or acknowledgement of payment, and is *of a contractual nature*—as where the consideration consists of the mutual promises of the parties—the statement constitutes a term of the contract which may not be varied by parol testimony attempting to show that the consideration was other than as stated in the written instrument. Thus it is not permissible by extrinsic evidence to insert into the contract a condition or provision for its termination which is not expressed therein.[37]

 It is clear that in this case Mercury's claim is not based on *absence or want of* consideration. The contract did provide for contractual consideration in the form of a guaranteed annual amount. Rather, Mercury's claim to *failure of consideration,* while appearing to be premised on after-developed facts—i.e., lost percentage rentals during the term of the lease because of poorly managed operations—was in fact based on conditions—i.e., Mercury's right to claim percentage rentals and Woolworth's duty diligently to produce

**31.** *Douglass v. Douglass,* 199 Okl. 519, 188 P.2d 221, 223 [1947].

**32.** *Wallace v. Ralph Pillow Motors, Inc.,* 344 So.2d 949, 950 [Fla.App.1977].

**33.** *Holm v. Woodworth,* 271 So.2d 167, 169 [Fla. App.1972].

**34.** *Batsakis v. Demotsis,* 226 S.W.2d 673, 675 [Tex.Civ.App.1949].

**35.** *Clarke v. Clarke,* 194 Okl. 455, 152 P.2d 908, 910 [1944] (where in a written contract the statement of consideration is a mere recital amounting to a receipt and is not contractual in form, parol evidence is admissible to provide the true consideration); *Bobo v. Bigbee,* Okl., 548 P.2d 224, 229 [1976] (parol evidence is admissible to show failure of consideration as a defense to specific performance and the mere recital in a written agreement that a stated consideration had been given may be contradicted by parol); *Henry v. Hope,* Okl., 317 P.2d 239, 241 [1957]; *Berry-Beall Dry Goods Co. v. Francis,* 104 Okl. 81, 230 P. 496, 497 [1924].

**36.** *Fredrick v. Ludwig,* 112 Okl. 217, 240 P. 1049 [1925]; *Jackson v. Cleage,* 193 Okl. 210, 142 P.2d 111, 114 [1945]; *Strickland v. Hetherington, supra* note 30 at 140.

This is consistent with Restatement (Second) of Contracts, § 218(2) [1981] which provides: "(2) Evidence is admissible to prove whether or not there is consideration for a promise, even though the parties have reduced their agreement to a writing which appears to be a completely integrated agreement."
Comment "d" to § 218 explains that:
"Where a written agreement requires consideration and *none is stated in the writing,* a finding that the writing is a completely integrated agreement would mean that it is not binding for want of consideration. Since only a binding integrated agreement brings the parol evidence rule into operation, evidence is admissible to show that there was consideration and what it was." [emphasis added]

**37.** *Warren v. Pulley,* 193 Okl. 88, 141 P.2d 288, 290–291 [1943]; *Brashears v. Edwards,* 208 Okl. 449, 257 P.2d 295, 298 [1953].

them—which were dealt with and contemplated by the parties when they entered into the agreement. This is borne out by an examination of the lease agreement: (a) the lease contained a provision that disclaimed any obligation on Woolworth's part to produce a certain level of percentage rentals and (b) the absence of any other term in the contract that would allow termination of the instrument because percentage rentals were not generated. Thus, while the very foundation of Mercury's failure-of-consideration theory is its claim to percentage rentals, its right to them must be regarded as a condition that was not only within the contemplation of the parties but one that was expressly dealt with in the lease. In short, failure of consideration cannot be inferred from continued nonpayment of percentage rentals.

### SUMMARY

■ Woolworth's inability to bring its sales within the range of lease-created liability for percentage rentals constituted neither a default in performance that was Mercury's due nor a failure of consideration legally essential to maintain Woolworth's status as lessee. *No* duty stood imposed upon Woolworth, *qua* tenant, to generate *any* specific amount of receipts— and none may be rested upon it in this lawsuit by inference from the four corners of the lease. Nay, the existence of the duty Mercury now seeks to have us infer here is plainly and conclusively contradicted by the parties' agreement whose face refutes its presence in clear and unambiguous terms.[38] No breach of promise to Mercury—express or implied—can hence arise from Woolworth's nonpayment of percentage rentals.

■ Because a breach from nonpayment of percentage rentals cannot be said to have been within the contemplation of the parties, there was no default in Wool-

worth's performance. The sufficiency of minimum or base rentals as a principal consideration for the lease is not a fit subject for judicial scrutiny. Courts do not possess a gauge for measuring or weighing the adequacy of an agreed *quid pro quo.* If, as here, consideration appears to have been a bargained-for benefit to the promisor and a detriment to the promisee, it must be deemed to have been accepted as more than just nominal. It is hence sufficient in law to support the promise.[39]

■ The lease is written in plain, clear and unambiguous language. There is hence no room for construction. Summary denial of lease termination decree for failure of consideration is entirely free from legal error.

The Court of Appeals' opinion is vacated and the trial court's judgment reinstated.

HODGES, LAVENDER, KAUGER and SUMMERS, JJ., concur.

SIMMS, C.J., DOOLIN, V.C.J., and HARGRAVE and ALMA WILSON, JJ., dissent.

---

**38.** If the language of a contract is clear and free of ambiguity, the court is to interpret it as a matter of law; similarly, the existence of an ambiguity is a decision to be made by the court. *Corbett v. Combined Communications Corp. of Oklahoma, Inc.,* Okl., 654 P.2d 616, 617 [1982].

**39.** *Ledford v. Wheeler,* Okl.App., 620 P.2d 903, 906 [1980]; *Cox v. Freeman,* Okl., 227 P.2d 670, 678 [1951] and *Dunn v. Thompson,* 156 Okl. 169, 9 P.2d 959 [1932].