**WILLIAM L. PATTON, JR. FAMILY LIMITED PARTNERSHIP, LLLP, et al.  Plaintiffs**

v.

**SIMON PROPERTY GROUP, INC., et al.  Defendants**

No. 4:04CV1477GH.

United States District Court,
E.D. Arkansas,
Western Division.

May 13, 2005.

Debra K. Brown, Robert Shults, Steven T. Shults, Shults Law Firm, LLP, Little Rock, AR, for plaintiff.

Philip S. Anderson, David M. Powell, Williams & Anderson, Little Rock, AR, for defendant.

## ORDER

GEORGE HOWARD, JR., District Judge.

This lawsuit involves a written ground lease agreement between plaintiffs who are owners and lessors of the University Mall in Little Rock, Arkansas, and defendants, who are ground lessees. The parties or their predecessors signed the lease agreement in 1965, and have amended it in writing six times. Plaintiffs have filed this action, asserting two claims.

In the first claim, plaintiffs contend that defendants breached an express covenant of the lease agreement, requiring defendants to maintain the property in good and tenantable repair, Plaintiffs seek an injunction requiring defendants to restore the University Mall to good and tenantable repair, order and condition as required by the lease agreement.

In the second claim, plaintiffs contend that defendants have an implied obligation under the lease agreement to locate and maintain viable retail tenants at the University Mall, so that percentage rental income will be generated. Plaintiffs seek damages as a result of the loss of rentals.

Defendants have filed a motion to dismiss the second claim, asserting that there is no implied covenant as pled by Plaintiffs that is recognized under Arkansas law, and that therefore, Plaintiffs have failed to state a claim for which relief may be granted.[1]

On October 1, 1965, the predecessors of the parties in this action entered into a ground lease agreement (Agreement) which permitted defendants to develop the grounds into the University Mall at defendants' own expense, known as a ground lease. The Agreement is to remain in effect until December 31, 2026. The Agreement has been amended six times between 1965 and 1988. The Agreement provided that defendants agreed to enter into subleases with third parties and to pay both base rentals and additional rentals to Plaintiffs based upon minimum rentals, percentage rentals and other amounts paid by defendants' subtenants. A minimum base rent is guaranteed, whether percentage rent payments are paid under the lease.

Plaintiffs contend that the language of the Agreement creates a duty for defendants to enter into subleases with retail tenants so that percentage rents can be generated. It points to certain provisions in the Agreement, from which such a duty can be inferred. Article I, which was amended four times, specifies defendants' obligation to pay base and percentage rentals. Plaintiffs also point to the mortgage provisions in Article IV of the Agreement, where the loan secured by the mortgage "shall be subject to payment, principal and interest, as the same becomes due, from Lessee's rental income from sublessees" and that "payments on the mortgage shall not exceed rentals payable to Lessee by AAA1 rated sublessees," (Article IV, Section 4.1.(c) and (e))

The Fourth Amendment executed in 1986, dealt in part with financing a $10 million expansion of University Mall. Section 4.3(a) of the Fourth Amendment provides that "any loan secured by a mortgage ... shall be subject to payment, principal and interest, as the same becomes due, from Lessee's rental income from subleases."

---

1. Plaintiffs, in a letter to the Court, asked for a hearing on the motion. The matter has been well-briefed by the parties and the Court is not persuaded that a hearing is necessary.

The Fifth Amendment, executed in September, 1987, deletes the previous Section 4.3(a) and provides for a mortgage of $15 million with the loan secured by the mortgage subject to payment "from Lessee's rental income from subleases."

In addition to these provisions, Plaintiffs state that additional unpled facts would support their claim, and that they should be given an opportunity amend their claims after discovery.

In considering a motion to dismiss, the Court must accept the allegations contained in the complaint as true, and all reasonable inferences from the. complaint must be drawn in favor of the nonmoving party.. "[D]ismissal is inappropriate 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *McCormack v. Citibank, N.A.,* 979 F.2d 643, 646 (8th Cir.1992) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)).

■ There is no dispute that Arkansas law is applicable. "The construction and legal effect of a written lease contract are to be determined by the court as a question of law, except where the meaning of the language depends on disputed extrinsic evidence... When contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the writing in accordance with the plain meaning of the language employed." *Holytrent Properties, Inc. v. Valley Park Ltd. P'ship,* 71 Ark.App. 336, 339, 32 S.W.3d 27 (2000).

■ As a general rule implied covenants are not favored in the law. "This view owes its force to the presumption that when the parties have entered into a written agreement that embodies their obligations, they have expressed all of the conditions by which they intend to be bound. Courts are reluctant to imply covenants where the obligations sought to be imposed on the contracting parties are not expressed in the written text." *Mercury Inv. Co. v. F.W. Woolworth Co.,* 706 P.2d 523, 530 (Okla., 1985) *See also* 20 Am. Jur.2d *Covenants, Conditions, and Restrictions,* § 29 (2004)("[I]mplied covenants are not favored in the law. The courts will declare implied covenants to exist only where there is a satisfactory basis in the express contract of the parties which makes it necessary to imply certain duties and obligations in order to effect the purposes of the parties to the contract made.") Arkansas follows this view. *See Amoco Production Co. v. Ware,* 269 Ark. 313, 320–321, 602 S.W.2d 620, 623 (1980)("An implied covenant is one that may be reasonably inferred from the whole agreement and the circumstances attending its execution. They are not favored by the law and can be justified only upon the ground of legal necessity arising from the terms of the contract and the circumstances attending its execution.")

■ Plaintiffs argue that courts have found implied covenants in commercial leases when the lease contains a certain minimum or fixed base rental along with payment of percentage rents, as in this case. They rely on a legal doctrine known as the "implied covenant of continuous operations."

A continuous operation clause is [a]... covenant requiring the tenant to operate its business in the leased premises continuously throughout the term of the lease. This lease provision is commonly used in commercial leases for retail space within shopping centers. Landlords have three goals for the operation of their property: 1. Collecting as much rent as the market will bear in a timely and full manner; 2. keeping the center healthy and its tenants happy and successful; and 3. obtaining as much financing as possible and keeping its lender

satisfied. Store closings, whether temporary or permanent, could affect several aspects of the operation of a shopping center such as the vacancy rate, tenant mix, customer draw, profitability, or the ability to relet the space. Through continuous operation clauses, landlords seek to assure themselves of rental income from tenants for long periods of time, and to ensure that their shopping centers will not have any vacant stores that detract from the overall view of economic prosperity that a fully-leased shopping center presents.

Austin Hood, *Continuous Operation Clauses and Going Dark*, 36 Real Prop. Prob. & Tr. J. 365, 367 (2001) (citations and internal quotation marks omitted). Continuous operation clauses may be express or implied. "An implied clause is not explicitly stated in the lease, but may be inferred from other terms of the lease, such as percentage rent provisions, sublet or assignment clauses, and hours of operation clauses." *Id.* at 372.

The courts have applied a number of tests in determining whether a continuous operations covenant will be implied. Among the factors the courts take into account are: "(1) whether base rent is below market value, (2) whether percentage payments are substantial in relation to base rent, (3) whether the term of the lease is lengthy, (4) whether the tenant may sublet, (5) whether the tenant has rights to fixtures, and (6) whether the lease contains a noncompetitive provision." *Lagrew v. Hooks–SupeRx, Inc.*, 905 F.Supp. 401, 405 (E.D.Ky.1995) (percentage payments substantial in relation to pay rate, exceeding from 40% to 150% of base rent).

In general, "the adequacy of rent has been the most influential" factor. Joel R. Hall, *Operations Covenant* ALI–ABA Continuing Legal Education, July 28–31, 2004, Modern Real Estate Transactions.

The Oklahoma Supreme Court reviewed the law governing implied covenants in lease agreements, particularly where there is a provision for a guaranteed minimum rent and a further provision for a percentage rental.

The general rule enunciated in these decisions is that (1) the obligation must arise from the presumed intention of the parties as gathered from the language used in the written instrument itself or it must appear from the contract as a whole that the obligation is indispensable in order to give effect to the intent of the parties; and (2) it must have been so clearly within the contemplation of the parties that they deemed it unnecessary to express it. Recognized as a corollary to the general rule governing covenants that could be inferred from a written instrument is the principle that when the rental reserved in a lease is based upon a percentage of the gross receipts of a business and a guaranteed substantial minimum rent, a covenant would not be implied; but if the minimum rental is so low as to be nominal, or where there is no minimum rental, then a covenant might be implied.

*Mercury Inv. Co. v. F.W. Woolworth Co.*, 706 P.2d 523, 530 –531 (Okla.1985)

In *Mercury,* Woolworth agreed to pay a minimum base rent and additional percentage rental only if sales passed a certain level. The court refused to find an implied covenant that Woolworth "diligently operate its business in such a manner as to generate percentage rentals and to attract customers to the shopping center for the benefit of other tenants as well." *Id.* at 527. The court noted that there was nothing contained in the lease by which Woolworth promised to operate its business in such a way as to increase gross receipts or to "accelerate customer traffic flow for the benefit of the other tenants."

*Id.* at 531. Not only did the express provisions of the lease agreement negate an implied covenant, the court found that the implied covenant as articulated by the shopping center landlord was "amorphous" and was not possible to enforce. *Id.* at 532.

> The lease is cast in the form of a highly sophisticated document employing clear, precise and unambiguous language that covers a myriad of details regarding the parties' relationship as landlord vis-a-vis tenant. In the face of its comprehensive terms, this court is powerless to add a covenant requiring Woolworth to generate sales that would subject it to liability for percentage rentals. The parties could have inserted an explicit termination clause to be triggered by continued failure of Woolworth to reach some agreed level of gross receipts within a specified period. To now imply the covenant pressed for by Mercury would be to rewrite the parties' agreement. We should be loath to hold Woolworth to any greater level of business productivity than Mercury itself was able to exact from a willing tenant.

*Id.* at 532. *See also* Am.Jur. *Landlord,* § 69 ("Additionally, the courts have refused to imply a covenant that the lessee must diligently operate its business in such a manner as to generate the percentage rentals, where the lease expressly provides that the lessee declines to guaranty any level of sales will be generated on the leased premises, even where the lessor argues that the lessee permitted its business to deteriorate, thus limiting the receipts which the lessor would have received under the percentage provisions.") "Courts are generally reluctant to imply a covenant of continuous operation absent express language in the lease." John C. Murray, *Percentage Rent Provisions in Shopping Center Leases: A Changing World,* 35 Real Prop. Prob. & Tr. J. 731, 760 (2001) (discussing cases)

■ At first glance, the covenant of continuous operation appears not to apply to the situation here. This action does not involve a lease between a shopping center or mall owner and a large retailer. As a ground lessee, defendants do not sell products which generate percentage rentals. They lease space to subtenants who through their sales generate enough income to produce percentage rentals. No court has imposed a covenant on a ground lessee of the premises of a shopping mall. Furthermore, in cases where the covenant has been found, the retail tenant has ceased operations, and the concern is over the result from the loss of the anchor tenant's customer traffic to other shopping center tenants. Here, defendants have not ceased operations.

The court in *Oakwood Village LLC v. Albertsons, Inc.,* 104 P.3d 1226, 2004 UT 101 (Utah 2004), found that the existence of a ground lease rather than a lease of an already constructed commercial building is detrimental to the claim that the lease implies a covenant of continuous operation.

> The law has clearly established that a tenant has significantly more flexibility and control over the premises under a ground lease than it has under a building lease. Indeed, "a ground lease is best considered as a financing device for developing unimproved land. The lessor's role is similar to that of a secured lender, and the lessee pays most of what is necessary to develop the land and protect the lessor's role as passive investor." *Airport Plaza, Inc. v. Blanchard,* 188 Cal.App.3d 1594, 234 Cal.Rptr. 198, 201 (1987).
>
> In many ways ground leasing bears a closer relationship to the fee purchase of real property than to the short-term commercial lease transaction.... Indeed, the ground lease has traditionally been used to acquire the functional

equivalent of fee simple ownership of property.... Unlike the short-term leasing context where [the] landlord's consent is required for such things as improvements, subleases and changes in use, the tenant under a long-term ground lease generally has the same unqualified freedom with respect to the property as a fee simple owner. It should be understood that the lessor under a long-term, net ground lease has effectively given up real estate investment in return for what essentially is a fixed-return investment, comparable to a bond.

Thompson, *supra*, § 44.13(a), at 482, 483 n. 218. The increased flexibility and control a lessee exercises over the leased premises under a ground lease than under a building lease makes it especially important for the lessor to secure certain assurances from the lessee in a ground lease. This is because "[o]nly the standards set forth in the ground lease will provide the landlord with some assurance that the construction, operation, and maintenance of the property and improvements will be sufficient to produce rent for the landlord...." Jerome D. Whalen, Commercial Ground Leases § 1.1.1, at 2, 5–6 (1988). Unfortunately for Oakwood, it evidently failed to secure from Albertsons any assurances that Albertsons would operate a grocery store on the premises for the duration of the lease.

*Id.* at 1239, 2004 Utah at 40.

Even assuming that the implied covenant of continuous operation was applicable to a ground lease, the Court could not find it applicable here. The express language of the lease agreement precludes implying the covenant. The negotiated contract was the result of negotiations between two sophisticated parties. It is a detailed document, and it along with the amendments set forth in unambiguous language the details concerning the parties'

relationship. On six separate occasions it was amended; the amendments contain language concerning base and percentage rentals. If the parties had wanted to include a duty on defendants to locate and maintain suitable retail tenants, they had ample opportunity to include such language in the amendments. "Faced with the clear language of the document negotiated by the parties themselves, this Court will not imply a covenant which would restrict one party's freedom to conduct its own business as it sees fit. The parties were capable of including such a provision in the express language of the contract and failed to do so. To imply such a covenant would amount to rewriting the parties' agreement; an act this Court will not perform." *Keystone Square Shopping Center Co. v. Marsh Supermarkets, Inc.* 459 N.E.2d 420, 423 (Ind.App.1984).

Other factors weigh against the finding of an implied covenant. Language in the Fourth Amendment indicates that the addition of any implied obligation would be inconsistent with the parties' intention. Paragraph 6 of the Fourth Amendment, which contained explicit provisions regarding the payment of base rents, percentage rents and other charges, states as follows:

It is understood and agreed by Lessors and Lessee that upon their execution of this Fourth Amendment, the first Letter Agreement, Second Letter Agreement and 1980 Amendment shall be of no further force or effect and the entire agreement of the parties shall consist of those written terms, covenants and conditions contained in the agreement, the April, 1968 Amendment, the June, 1968 Amendment, and this Fourth Amendment.

The presence of an "any lawful use" provision in the lease also precludes the finding of an implied covenant of continuous operation. *See Piggly Wiggly South-*

*ern, Inc. v. Heard*, 405 S.E.2d 478, 261 Ga. 503 (1991). Here, Section 2.1 of the Agreement provides: "Lessee may use the Demised Premises for any lawful purpose" during the term of the lease.

Moreover, the base rent in this case is not insubstantial. According to the Fourth Amendment, Plaintiffs are receiving minimum annual rentals of $210,-000.00 [2]

Plaintiffs point to Arkansas cases concerning oil and gas or mineral leases to support a finding of an implied covenant. Their reliance on these cases is misplaced. The leases in the oil and gas or mineral context are generally found to have an implied covenant on the part of the lessee for diligent exploration and development so that the lessor may obtain the compensation which is an intrinsic part of the contract. Indeed, in *Mansfield Gas Co. v. Alexander*, 97 Ark. 167, 133 S.W. 837 (1911), the sole compensation to the lessor was the royalties he might receive, and the only way to obtain the compensation was by the lessee obtaining the minerals. The court found that it was evident from the language and purpose of the lease that there was an implied covenant in the lease on the part of the lessee to search for, and if found, to obtain minerals from the ground, "The plain object of such leases is that there will be a diligent search made on the leased land for the minerals and if discovered a diligent operation thereof. By this lease an exclusive right to make such search and to mine the discovered product was given to the lessee for a long term of years. The sole compensation of the lessor was in the royalties which he might receive, and if there was no product, there was no benefit to the lessor." *Id.* at 839. "In the construction of mineral leases such as is involved in this case, the authorities uniformly hold that there is an implied obligation on the part of the lessee to proceed with the search and also with the development of the land with reasonable diligence according to the usual course of such business, and that a failure to do so amounts in effect to an abandonment and, works a forfeiture of the lease." *Id.*

The obligation Plaintiffs seek to impose on defendants is a far cry from the specific obligations recognized by courts in oil and gas or mineral leases. Indeed, the Arkansas Supreme Court has rejected an implied lease obligation in a different situation, somewhat more analogous to the case at bar. In *Meers v. Tommy's Men's Store, Inc.*, 230 Ark. 49, 320 S.W.2d 770 (1959), the court refused to find that the lessee had an obligation to occupy the entire building when the lessee left three of the five floors unoccupied. "Had it been the intention of the parties that Tommy was obligated to occupy all five floors personally or through sub-tenants on penalty of forfeiture of the lease if he failed to do so, in would have been very easy to have said so in plain terms ..." *Id.* at 54, 320 S.W.2d at 773.

Similarly, Arkansas has refused to find a cause of action for tortious breach of the implied covenant of good faith and fair dealing. "The fact that every contract imposes an obligation to act in good faith does not create a cause of action for a violation of that obligation, and, as discussed above, this court has never recognized a cause of action for failure to act in good faith.... Without a cogent reason supported by convincing authority for taking this step, we decline to recognize this new tort in Arkansas." *Country Corner Food and Drug, Inc. v. First State Bank*

---

**2.** According to Section 1.3(d)(2) of the Fourth Amendment, Section defendants are to pay $17,250.00 monthly.

*and Trust Co. of Conway, Arkansas,* 332 Ark. 645, 655–656, 966 S.W.2d 894, 899 (1998)

As the court stated in *Oakwood,* the "lease is a complete and unambiguous agreement between competent commercial parties. Long-term commercial leases, by their nature, are risky. Neither side can foretell future market conditions with any certainty. We presume that both Oakwood and Albertsons bargained for the best terms and conditions each could get. Each party took the risk that unpredictable market forces would at some later day render the contractual terms unfavorable to themselves. Despite this risk, both parties willingly agreed to the terms in the lease. It is not our role to intervene now, construing the contract's unambiguous terms to mean something different from what the parties intended them to mean at the outset." 104 P.3d at 1241, 2004 UT at 85.

Thus, the Court cannot find that there is an implied covenant on the part of defendants to locate and maintain viable retail tenants. As a claim for breach of the implied covenant as pled by Plaintiffs is not legally cognizable, additional discovery will not assist plaintiffs. "[D]ismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and deigned to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles, Mo.* 244 F.3d 623, 627 (8th Cir.2001).

Accordingly, the motion to dismiss the second claim is hereby granted. The motion for a protective order staying discovery pending resolution of the motion to dismiss is denied as moot.