445 S.E.2d 176

**FREDERICK BUSINESS PROPERTIES COMPANY, a Corporation, Plaintiff Below, Appellant,**

v.

**PEOPLES DRUG STORES, INC., a Corporation, Defendant Below, Appellee.**

No. 21806.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 18, 1994.

Decided May 20, 1994.

---

236

Charles F. Printz, Jr. and David A. DeJarnett, Bowles, Rice, McDavid, Graff & Love, Martinsburg, for appellant.

Patrick J. Nooney, Steptoe & Johnson, Hagerstown, MD, for appellee.

BROTHERTON, Chief Justice:

In this case, we are asked to determine whether a commercial lease agreement contained an express or implied covenant of continuous use which obligated the appellee, Peoples Drug Stores, Inc., to continue to operate its drug store on the demised premises during the lease term and to pay percentage rentals to the appellant, Frederick Business Properties Company.

An agreed statement of facts submitted by the parties explains that on March 31, 1965, Del Ankers and John Manfusco, Jr., as lessors, and Peoples Drug Stores, Inc., a West Virginia corporation, as lessee, entered into a fifteen-year lease agreement for a one-story storeroom at the Berkeley Plaza Shopping Center, Martinsburg, West Virginia. Peoples Drug subsequently extended the lease agreement, in accordance with its terms, for

two periods of five years each, resulting in a final expiration date of October 31, 1990.

Frederick Business Properties Company was not a party to, nor privy to, the negotiations which resulted in the execution of the original March 31, 1965, lease agreement. That agreement required the use of the demised premises only for the conduct of a drug store and also provided that the tenant, Peoples Drug, made no representation or warranty as to the sales it expected to make in the leased premises.

On April 1, 1988, Frederick Business Properties Company, a Maryland corporation authorized to do business in West Virginia, purchased the Berkeley Plaza Shopping Center and the lease agreement. Peoples Drug was neither a party to, nor made privy to, any of the negotiations leading up to and resulting in the sale of Berkeley Plaza Shopping Center and the lease agreement.

On April 25, 1988, Peoples Drug entered into a lease agreement with a business partnership that is not party to this litigation and leased premises at the Olde Courthouse Square Shopping Center, Martinsburg, West Virginia, which is located between one-half and one mile from the Berkeley Plaza Shopping Center.

Peoples Drug continued to operate its drug store at the Berkeley Plaza Shopping Center until September 11, 1988, at which time Peoples Drug ceased operations at the demised premises and moved to the new leased premises. Under the terms of the lease agreement at issue in this case, Peoples Drug was obligated to pay annual or minimum rent in the amount of $18,900. Peoples Drug fully paid this rent through October 31, 1990, when the second renewal term expired.

Peoples Drug was also contractually obligated to pay as "percentage rent" a sum equal to the amount by which 3.5% of all gross sales exceeded the annual rent paid during the lease year, if any. Peoples Drug paid percentage rent in accordance with a computation formula provided in the lease agreement for sales at the demised premises until and including a payment for lease year 1988. Payment records belonging to Peoples Drug for lease years 1982 through 1988, along with its net sales figures for lease years 1985 through 1988, are the only sales and payment data available to the parties herein, and are as follows:

| Lease Year | Total Rent Paid (Includes Minimum Rent) | Percentage Rent Paid | Net Sales |
|---|---|---|---|
| 1982 | $48,333.64 | $29,433.64 | ----------- |
| 1983 | $53,662.31 | $34,792.31 | ----------- |
| 1984 | $59,232.14 | $40,332.14 | ----------- |
| 1985 | $63,007.94 | $44,107.94 | $1,800,227 |
| 1986 | $66,044.06 | $47,144.06 | $1,886,973 |
| 1987 | $71,262.73 | $52,362.75 | $2,036,078 |
| 1988 | $51,829.26 | $32,929.26 | $1,480,836 |

The parties herein never discussed renegotiating the lease agreement for a term to begin following the expiration of the lease's second renewal term, which expired on October 31, 1990.

Peoples Drug maintains that its decision to cease business operations at the demised premises was based upon projections of less favorable economic conditions at that location in the future, including declining sales, growth, and profits, and rising costs, because of changing market conditions relating to the Berkeley Plaza Shopping Center, including customer flow and mix, tenant mix, the closing of other businesses in the shopping center, and incidents of crime and vandalism in the shopping center area.

Frederick Business Properties contends that when Peoples Drug relocated its drug store to the Olde Courthouse Square Shopping Center, it diverted sales from the demised premises, resulting in economic harm to Frederick Business Properties.

On August 17, 1990, Frederick Business Properties Company filed suit against Peoples Drug in the Circuit Court of Berkeley County, West Virginia, seeking damages for an alleged breach of the commercial lease agreement. Both parties filed motions for summary judgment which focused on the issue of whether the lease agreement contained an express or implied covenant of continuous use, thereby obligating the appellee to continue to operate its drug store on the demised premises during the lease term and to pay the appellant percentage rentals due.

In an order entered December 17, 1990, the trial court stated that "the application of the lease agreement between these parties involves a legal issue, not one involving questions of fact...." The court noted that it anticipated a further hearing on a motion for summary judgment.

That hearing was held on June 17, 1991. Thereafter, the trial court concluded that "the lease agreement at issue does not contain either an express or an implied covenant which required the Defendant to operate a drug store at the Berkeley Plaza Shopping Center, Martinsburg, West Virginia until October 31, 1990." The court also found that "there is no requirement, either express or implied, in the lease agreement at issue providing that a relocated business be used for the payment of percentage rent to the Plaintiff." By order entered June 27, 1991, the trial court adopted the parties' agreed statement of facts, denied the appellant's motion for summary judgment, and answered the questions of law jointly submitted by counsel as follows:

> Question 1: Whether the subject lease agreement contains a covenant which requires Defendant to continue to operate or to continuously operate a drug store on the demised premises until October 31, 1990, when the second renewal term expired.
> Answer by the Court: No.
> Question 2: Whether the subject lease agreement contains a covenant to pay a reasonable rent which required Defendant to pay to the Plaintiff for the period of time between September 11, 1988, and October 31, 1990, when Defendant was not operating a drug store on the premises, rent monies in addition to the minimum rent provided for in said lease agreement, in order to provide the Plaintiff what it contends is a fair rental value for the demised premises.
> Answer by the Court: No.
> Question 3: Whether the subject lease agreement contains a covenant of good faith and fair dealing requiring the Defendant to continue to operate and to not cease operating a drug store at the Berkeley Plaza Shopping Center until October 31, 1990, when the second renewal term

expired and to not begin to operate a drugstore at the Olde Courthouse Square Shopping Center prior to October 31, 1990.

Answer by the Court: No.

The circuit court then certified the questions to this Court, pursuant to W.Va.Code § 58–5–2. By order dated March 12, 1992, this Court refused to docket the certified questions.

After a May 18, 1992, status review hearing, the trial court granted the appellant leave to move the trial court to reconsider the June 27, 1991, order which denied the appellant's motion for summary judgment on the issue of liability, and granted leave to the appellee to renew its motion for summary judgment. In its May 26, 1992, order, the trial court noted that it appeared that "the recent decision of the Supreme Court of Appeals, *Thompson Development Co., Inc. v. The Kroger Co.* [186 W.Va. 482, 413 S.E.2d 137 (1991)] involved substantially similar issues and that in light of the Agreed Statement of Facts, the parties should be afforded a further opportunity to address the Court on the applicability of the *Thompson Development* case to the parties' respective motions...."

A hearing was held on July 20, 1992, and by order dated September 22, 1992, the trial court granted the appellee's renewed motion for summary judgment, denied the appellant's motion for summary judgment on the issue of liability, and dismissed the case with prejudice.

The appellant, Frederick Business Properties, now appeals the lower court ruling and asserts several errors which relate to the application of *Thompson Development, supra,* to the facts of the case now before us. Although we do disagree with several points made by the trial court in its analysis of the *Thompson Development* factors, our conclusions weigh even more strongly against the implication of a covenant of continuous operation. Therefore, for the reasons set forth below, we affirm the judgment of the Circuit Court of Berkeley County.

█ In syllabus point 2 of *Thompson Development,* this Court stated that:

In determining whether an implied covenant of continuous operation exists in a lease, the following factors should be taken into consideration: 1) whether the lease contains an inconsistent express term or a provision for a substantial fixed base rent; 2) whether the lease contains a provision giving the tenant free assignability of the lease; 3) whether the lease was actively negotiated by all parties involved; and 4) whether the lease contains a noncompetitive provision.

The appellant argues first that the trial court misinterpreted and misapplied *Thompson Development* when it determined the effect of a noncompetitive provision. The trial court indicated that because the lease's noncompetition clause benefited the appellee/tenant, Peoples Drug, the existence of the noncompetition clause weighed in favor of the appellee's argument that there was no implied covenant of continuous operation.

The appellant maintains that in *Thompson Development* we held that the existence of a noncompetition clause weighed in favor of implying a covenant of continuous operation. However, we did not make this broad assertion in *Thompson Development*. Instead, we stated that whether the lease contains a noncompetitive provision is *one of the factors* which *should* be taken into consideration when determining whether an implied covenant of continuous operation exists in a lease.

To be more specific, in *Thompson Development* we cited the decision in *Carl A. Schuberg, Inc. v. Kroger Co.*, 113 Mich.App. 310, 317 N.W.2d 606 (1982), and stated that "some courts consider whether the lease contains a noncompetitive clause in determining whether to imply a covenant of continuous operation." *Thompson Development*, 413 S.E.2d at 141. In *Schuberg*, the Court of Appeals of Michigan noted the plaintiff's argument that "since a noncompetition clause was included in the contract to benefit Kroger, Kroger in return impliedly agreed to continuously occupy the premises." 317 N.W.2d at 610. However, the Michigan Court then stated that "courts consistently have refused to find that noncompetition clauses imply that a defendant is bound to continuously operate a business." *Id.* Although the *Thompson Development* lease contained a noncompetition clause, we concluded that "this factor is of slight import in deciding this issue," because the tenant released the landlord from this provision when it vacated the premises. *Thompson Development*, 413 S.E.2d at 142.

In the case now before us, the lower court noted that the lease agreement contained a noncompetition clause as well as a restriction on use requiring the premises to be occupied as a drug store.[1] The noncompetition clause provided that the landlord "shall not permit any other tenant or occupant within the Shopping Center ... to fill prescriptions or to operate a drugstore." However, in one of the typed changes to the agreement, the parties agreed that the landlord would not take legal steps to prevent such business if it involved J.C. Penney, Acme, or McCrory. Peoples Drug argues that this "had the effect of materially diluting the strength of the noncompetition clause."

The lease did not contain any specific provisions which precluded Peoples Drug from operating a drug store within a specific geographical area or limitation. Thus, nothing in the lease agreement prevented Peoples Drug from opening its new store at the nearby location. The lower court concluded that the net effect of having a noncompetition clause and a restriction on use in the lease was "somewhat neutral."

■ With regard to the noncompetition clause, the appellant states that "[t]he inability of a landlord, due to a binding agreement with a tenant, to lease space in the shopping

---

1. "Courts construe a lease clause stating that 'tenant will use leased premises for the purpose of ...' as allowing the prescribed use but not requiring it." Comment, *Commercial Leasing: Implied Covenants of Operation in Shopping Center Leases*, 95 Dick.L.Rev. 383, 391 (1991).

"The general principle is that a lessee is not obligated to operate a particular business on the leased premises. *See generally Weil v. Ann Lewis Shops, Inc.*, 281 S.W.2d 651 (Tex.Civ.App.1955); *Davis v. Wickline*, 205 Va. 166, 135 S.E.2d 812 (1964). Specific language to the contrary can impose such a requirement. However, many courts have construed even very strong language as only restricting the use of the property, and not as mandating that the property be used in fact for the specified purpose." *Stevens v. Mobil Oil Corp.*, 412 F.Supp. 809, 815 (1976).

center to a competitor of the tenant, inures to the benefit of the tenant by eliminating any such competition." However, the appellant then argues that "[i]n consideration for the landlord entering into such a binding agreement, the tenant impliedly agrees to continue to operate its particular type of business at the shopping center during the time such binding agreement is in effect." We disagree with this proposition. The mere existence of a noncompetition clause, in and of itself, does not require a court to find an implied covenant of continuous operation in a lease. Again, we reiterate that whether the lease contains a noncompetitive provision is just one factor that a court should consider. As we noted above, "Courts consistently have refused to find that noncompetition clauses imply that a defendant is bound to continuously operate a business." *Schuberg*, 317 N.W.2d at 610.

■ Next, the appellant argues that the trial court abused its discretion when it found that three of the four *Thompson Development* factors were present in this lease agreement but did not find that a covenant of continuous operation should be implied. The appellant is referring to the fact that the trial court concluded that (1) the lease agreement contained no inconsistent express terms and the percentage rental was substantial; (2) the tenant did not have free assignability of the lease; and (3) the lease contained a noncompetitive provision. However, we disagree with the trial court's analysis on several of these points.

Addressing the first factor outlined in *Thompson Development*, the trial court stated that "there is no inconsistent provision in the contract which specifically sets forth that there is or is not an obligation of continuous operation." We find that although there is no specific provision in the lease agreement which addresses the issue of continuous operation, *there are* provisions in the lease which are inconsistent with *implying* a covenant of

continuous operation. First, a merger clause[2] in the lease agreement provides that:

> This instrument embodies all the agreements between the parties hereto in respect to the premises hereby leased, and no oral agreements or written correspondence shall be held to affect the provisions hereof. All subsequent changes and modification to be valid shall be by written instrument executed by Landlord and Tenant.

In *Peoples Service Drug Stores, Inc. v. Mayfair, N.V., (Micora, N.V.), King Investors, Ltd.*, 50 N.C.App. 442, 274 S.E.2d 365, 369 (1981), the Court of Appeals of North Carolina interpreted this same merger clause to be "evidence of the intention of the parties to the lease that it constitute their entire agreement, and that conflicting oral agreements should not be allowed to vary its terms." Similarly, in *Thompson Development*, we noted that "the lease expressly provides that '[n]o obligation not stated herein shall be imposed on either party hereto.' *This provision directly conflicts with implying a covenant of continuous operation.*" *Id.* 413 S.E.2d at 141 (emphasis added).

In addition to the merger clause, the lease agreement permitted the tenant to remove furniture, fixtures, and equipment from the lease premises "at any time either during or at the expiration of the term of this lease...." "If a lease expressly grants the tenant the right to remove fixtures or equipment, courts have held that no implied covenant to operate was intended."[3] "[I]n the face of express provisions in the contract, allowing lessee to sublease the premises and to remove fixtures from the premises, such a covenant could not be implied. *Kroger Company v. Bonny Corp.*, 134 Ga.App. 834, 216 S.E.2d 341 (1975); *Williams v. Safeway Stores, Inc.*, 198 Kan. 331, 424 P.2d 541 (1967); *Lowe's of Shelby, Inc. v. Hunt*, 30 N.C.App. 84, 226 S.E.2d 232 (1976), *cert. denied*, 290 N.C. 662, 228 S.E.2d 452; *Brown v. Safeway Stores, Inc.*, 94 Wash.2d 359, 617

---

**2.** A "merger clause" is "[a] provision in a contract to the effect that the written terms may not be varied by prior or oral agreements because all such agreements have been merged into the written document." *Black's Law Dictionary* 989 (6th ed. 1990).

**3.** John M. Tyson, Article, *Drafting, Interpreting, and Enforcing Commercial and Shopping Center Leases*, 14 Campbell L.Rev. 275, 294 (1992).

P.2d 704 (1980); *Rapids Associates v. Shop-ko Stores, Inc.*, 96 Wis.2d 516, 292 N.W.2d 668 (App.1980)." *Bastian v. Albertson's, Inc.*, 102 Idaho 909, 643 P.2d 1079, 1082 (1982).

Another provision in the agreement which tends to conflict with implying a covenant of continuous operation states that "Tenant makes no representation or warranty as to the sales it expects to make in the leased premises." In *Mercury Investment Co. v. F.W. Woolworth Co.*, 706 P.2d 523 (Okla. 1985), one of the issues discussed by the Supreme Court of Oklahoma was whether Woolworth could be required to conduct its business in a "commercially prudent manner." The rental agreement provided that Woolworth was to pay a minimum base rental and additional percentage only if sales passed a certain threshold level. "The lease does not contain any express covenant by which Woolworth promises to so operate its business as to generate percentage rentals and to accelerate customer traffic flow for the benefit of other tenants. The express provisions of the lease agreement clearly negate the covenant sought to be implied against Woolworth." *Id.* at 531. In the lease, Woolworth "expressly declined to guarantee any level of sales expected to be generated by its business upon the leased premises." *Id.* The Court stated that "[a]n express covenant on a given subject-matter excludes the possibility of an implied covenant of a different or contradictory nature." *Id.*

Similarly, in this case, the disclaimer as to any guarantee of sales contradicts the argument that because the annual base rent was unsubstantial, the landlord expected to receive percentage rentals and, therefore, a covenant of continuous operation must be implied.

Next, we consider whether the lease agreement contains a provision for a substantial fixed base rent. The trial court concluded that "at the time of the [alleged] breach the payment under the percentage constituted a substantial portion of the total rentals paid ... the percentage payment of rent was not minimal; it was substantial." From this statement, it is apparent that in its inquiry the trial court focused on the percentage rent, and not whether the amount of fixed base rent was substantial.

Peoples Drug paid $18,900.00 per year as an annual minimum, or fixed base, rent at the demised premises. Peoples Drug argues that there is no factual basis from which to conclude that this rent was unsubstantial and that the $18,900.00 per year should therefore be viewed as constituting a substantial fixed base rent. Peoples Drug maintains that the appellant/lessor, Frederick Business Properties, offered no evidence to show that when the lease was negotiated in 1965, the fair rental value was substantially different from the annual minimum rent agreed upon by the parties to the lease agreement.

"The major prerequisite for a finding of an implied covenant in a percentage rental agreement is that the stipulated minimum rental must not be substantial consideration." *Bastian v. Albertson's, Inc.*, 102 Idaho 909, 643 P.2d 1079, 1082 (1982). "The burden of showing a disparity between fixed rent and fair rental value such as to furnish ground for implying a covenant to operate would be on the *lessors*." *Stop & Shop, Inc. v. Ganem*, 347 Mass. 697, 200 N.E.2d 248, 252 (1964) (emphasis added). "[I]n the absence of evidence that the minimum rent is unsubstantial, courts generally do not infer a covenant to continue operations." *Schuberg*, 317 N.W.2d at 609.

In this case, the lessors offered no evidence indicating that the fixed annual rent was either inadequate or unsubstantial at the time the lease was originally negotiated. Thus, there is no evidence from which a court can decide that the fair rental value in 1965 was substantially different from the annual rent agreed upon by the parties to the lease. There are circumstances under which the inadequacy of a base rent may provide a basis for implying a covenant of continuous operation. However, we find that the lessors presented inadequate evidence on that point and thus failed to meet their burden.

Another *Thompson Development* factor is whether the agreement contains a provision which gives the tenant free assignability of the lease. The trial court addressed this

issue by noting that "[t]here was a limitation on the subletting or assignment although the language is somewhat watered down in that it indicates that reasonable acquiescence by the plaintiff [Frederick Business Properties] would not be withheld. . . ." Still, the trial court concluded that this factor weighed in favor of the landlord, Frederick Business Properties, and its contention that there was an implied covenant of continuous operation.

In *Thompson Development,* the tenant had the right to assign the premises without the consent of the landlord "provided the business which such subtenant or assignee proposes to conduct does not conflict with exclusive rights granted by Landlord in leases to other tenants." In the case now before us, the lease provided that:

> Tenant may sublet the demised premises or any part thereof, remaining liable under the terms of this lease, but Tenant shall not assign this lease without the prior written consent of the Landlord which shall not be unreasonably withheld, provided, any subletting by the Tenant shall be subject to the exclusive covenants set forth on attached Exhibit D, however, Tenant shall have the right to transfer and assign this lease (a) to any subsidiary or affiliated company of Tenant, with Tenant remaining liable for the performance of the terms of this lease or (b) to any person or corporation acquiring all or substantially all of the assets of Tenant by purchase, merger, consolidation or otherwise.

Thus, a subtenant would be subject to exclusive restrictive covenants which had essentially the same effect as terms in the *Thompson Development* lease agreement which provided that the business a subtenant or assignee proposed to conduct could not conflict with the rights granted by the landlord in leases to other tenants. 413 S.E.2d at 140.

Most significant is the fact that the lease agreement herein specifically provided that the landlord could not *unreasonably* withhold consent if the tenant wanted to assign the lease. The lease also makes specific references to "assignees, subtenants or concessionaires" of the tenant, indicating that a sublease or assignment was anticipated, or at least foreseeable. We agree with the appellee, Peoples Drug, that even though the provisions may be somewhat "watered down," the existence of such language regarding assignment and subletting is nonetheless inconsistent with an implied covenant of continuous operation.

This brings us to consideration of the final *Thompson Development* factor: whether the lease was actively negotiated by all parties involved. The trial court found that there was some level of active negotiation by the original parties to this lease agreement. The appellant, Frederick Business Properties Company, argues that the trial court abused its discretion because it gave "overriding and dispositive weight to the one factor that it found to exist which does not weigh in favor of existence of the covenant of continuous operation."

We agree with the trial court's finding that there was some level of active negotiation between the original parties to the lease. As evidence of negotiation, the appellee noted that there were multiple insertions of typed language and many specific initialled approval blocks (eleven pages with twenty-four separate initialled acknowledgements by the parties) showing changes, additions, or other modifications to the lease agreement.

We do not agree with the appellant's assertion that the trial court gave "overriding and dispositive" weight to this one factor. The significance of active negotiation cannot be overstated. Courts must not ignore the freedom that parties have to enter into an agreement. "As a general rule implied covenants are not favored in the law. This view owes its force to the presumption that when the parties have entered into a written agreement that embodies their obligations, they have expressed all of the conditions by which they intend to be bound." *Mercury Investment Co. v. F.W. Woolworth Co.,* 706 P.2d 523, 530 (Okla.1985).

In the case now before us, the trial court considered a variety of factors as it determined whether or not a covenant of continuous operation should be implied. As our discussion thus far has indicated, we disagree with the trial court's findings in several in-

stances. Our conclusions on these points are briefly summarized as follows.

As we did in *Thompson Development,* once again we conclude that the effect of the noncompetition clause is minimal. Moreover, we believe this factor should never be dispositive of the issue, but should only be considered along with others which may or may not tend to weigh in favor of the existence of an implied covenant of continuous use.

The trial court found that the percentage rent paid was substantial, but did not consider the fixed base rent. We find that the lessor/appellant, Frederick Business Properties, did not meet its burden to present evidence that would show whether there was a disparity between the fixed base rent and the fair rental value so as to warrant the implication of a covenant of continuous operation.

The trial court found no inconsistent express terms, but we conclude that the merger clause is just one of at least three express terms in the lease agreement which conflict with implying a covenant of continuous operation.

Although the lease agreement did not technically give Peoples Drug the right to freely assign the lease, Peoples Drug was not completely restrained in this regard either. The landlord's consent was required, but consent could not be unreasonably withheld. The lease did permit the tenant to sublet the premises, but with restrictive covenants, and the lease specifically referred to the tenant's assignees, subtenants, or concessionaires in the percentage rent computation.

Finally, there is no question but that the parties to the lease agreement engaged in some level of active negotiation.

In *Thompson Development,* we indicated only that these factors "should be taken into consideration" when determining whether an implied covenant of continuous operation exists in a lease. After considering these and other provisions relevant to this lease agreement, the trial court concluded that it "must find in this case as a matter of law that the terms and conditions of the contract are not sufficiently clear within the auspices of *Thompson* to allow the implication of a covenant of continuous operation."

Although we have indicated disagreement with the trial court's analysis on several points, our findings with regard to these factors do not weigh in favor of implying a covenant of continuous operation. Instead, they weigh even more strongly against the implication. "An implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it, and therefore omitted to do so; or it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as a whole as gathered from the written instrument." *Percoff v. Solomon,* 259 Ala. 482, 67 So.2d 31, 40 (1953).

The terms of this lease are clear, definite and unambiguous. Therefore, we will interpret the lease as it was negotiated and written. We find no reason to imply a covenant of continuous operation where none was expressly provided for in the written agreement.

For the foregoing reasons, the September 22, 1992, order of the Circuit Court of Berkeley County is affirmed.

Affirmed.