### David C. LAGREW, et al., Plaintiffs,

v.

### HOOKS–SUPERX, INC., Defendant.

### Civ. A. No. 92–366.

United States District Court,
E.D. Kentucky,
Lexington.

March 10, 1995.

John H. Burrus, Landrum & Shouse, Lexington, KY, for plaintiffs.

Buckner Hinkle, Jr., Stites & Harbison, Lexington, KY, for defendant.

## MEMORANDUM OPINION AND ORDER

WILHOIT, District Judge.

This matter is before the Court on the motion of Hooks–SupeRx, Inc., for summary judgment, [Record No. 36], and cross-motion by plaintiffs for summary judgment that was filed at the Court's instruction on November

4, 1994, [Record No. 46].[1] The parties having fully briefed the issues, the matters stand submitted for determination.

## I.

### Factual Background

While the relevant facts are stated in the record in depositions, answers to interrogatories, and various attachments to the parties' briefs, the Court finds it necessary to recite several key facts. Plaintiffs, David C. Lagrew and his wife Betty J. Lagrew, along with Lois S. Lagrew, d/b/a Lagrew Properties, are successors-in-interest to the Beaumont Plaza Shopping Center ("Beaumont Plaza") in Harrodsburg, Kentucky. Defendant Hooks–SupeRx, Inc., ("SupeRx") is the successor-in-interest to the lease of a 6,300 square foot space in Beaumont Plaza. In this matter, the Court is asked to interpret the long-term commercial lease that was executed on October 17, 1966.

The initial term of the lease was fifteen (15) years with three five-year renewal options for a potential maximum term of thirty years. The lease provided for a base rent of $1.79 per square foot or $940.50 per month. In addition to base rent, the lessee must pay two percent of sales exceeding $564,300.00, excluding the sale of cigarettes and other tobacco products. The history of payments made under the lease is as follows:

| YEAR | BASE RENT | OVERAGES |
| --- | --- | --- |
| 1968 | $11,286 | $ 0 |
| 1969 | 11,286 | 0 |
| 1970 | 11,286 | 0 |
| 1971 | 11,286 | 0 |
| 1972 | 11,286 | 926 |
| 1973 | 11,286 | 2,547 |
| 1974 | 11,286 | 2,862 |
| 1975 | 11,286 | 3,648 |
| 1976 | 11,286 | 6,127 |
| 1977 | 11,286 | 7,160 |
| 1978 | 11,286 | 8,912 |
| 1979 | 11,286 | 11,025 |
| 1980 | 11,286 | 11,203 |
| 1981 | 11,286 | 12,297 |
| 1982 | 11,286 | 14,135 |
| 1983 | 11,286 | 17,075 |
| 1984 | 11,286 | 15,710 |
| 1985 | 11,286 | 11,874 |
| 1986 | 11,286 | 12,656 |
| 1987 | 11,286 | 12,019 |
| 1988 | 11,286 | 9,355 |
| 1989 | 11,286 | 4,592 |
| 1990 | 11,286 | 4,596 |
| 1991 | 11,286 | 0 |
| 1992 | 11,286 | 0 |

At the time the lease was executed, The Kroger Company, Inc., was operating a full service grocery store that served as the anchor tenant at Beaumont Plaza. Since Kroger was the parent company of defendant's predecessor, SupeRx, the leases executed between Beaumont Plaza and the two tenants was very similar.[2] SupeRx, did have the right to sublet the space with several significant limitations. They could not offer to sublease to food stores, department stores, variety stores, skating rinks liquor stores, beer taverns, or any other business that might interfere with the exclusive rights granted by the landlord in leases to other tenants. SupeRx also retained the property rights to its fixtures.

Due to declining profitability, SupeRx closed its doors in January, 1991. In all likelihood, this decision was related to the closing of Kroger, the anchor tenant, in January of 1988. SupeRx, while evaluating whether to discontinue operations, was notified by a leasing agent that negotiations had begun with Food Lion, another grocery store, however, they had not yet committed to signing a lease. While Food Lion did open at Beaumont Plaza on December 13, 1991,[3] SupeRx chose not to reopen its doors

---

1. On July 28, 1994, the Court granted summary judgment in favor of plaintiffs even though there had been no motion filed by plaintiffs and before the defendant had the opportunity to reply to the plaintiff's response. To correct this "precipitous" ruling, the Court set aside the Memorandum Opinion and Order. [Record No. 45]. The plaintiffs were instructed to file a properly supported cross-motion for summary judgment.

2. The Kroger Company subsequently divested itself of the SupeRx Drug Store chain. Hooks–

SupeRx became the new entity operating under the lease at the Beaumont Plaza.

3. According to Defendant's Response to Plaintiff's Motion for Partial Summary Judgment, [Record No.], Food Lion closed shortly after SupeRx had filed its Motion for Summary Judgment on December 20, 1993. This may be a significant factor in the determination of damages.

at the Beaumont Plaza location having already opened a new drug store at Gateway Shopping Center located one mile from Beaumont Plaza. SupeRx's Beaumont Plaza site remains vacant.

When SupeRx closed its doors in January of 1991, nearly two years were remaining on the second of three five year renewal option. On July 1, 1992, despite its move, SupeRx exercised its third renewal option on the lease at Beaumont Plaza. SupeRx attempted to sublet the Beaumont Plaza site to a discount store, Dollar General Store, but plaintiffs' representatives objected to the sublease in accord with the terms of the lease prohibiting the subleasing to a discount store.

SupeRx claims that three other enterprises expressed interest but decided against subletting, more than likely due to the ongoing litigation and the short time remaining on the lease. Plaintiffs, on the other hand, argue that they had begun preliminary negotiations with Rite–Aid Drug Company for the space at Beaumont Plaza. When they attempted to ascertain SupeRx's intentions in the spring of 1992, SupeRx refused to relinquish its rights to the final five year option. SupeRx disputes Rite–Aid's alleged interest in the space. First, they note that Rite Aid's interest hinged on the acquisition of a small pharmacy in Harrodsburg, a company that was eventually purchased by Hooks–SupeRx. Secondly, they note that if Rite Aid truly intended to use that space, they would have signed a lease "contingent" upon SupeRx's departure.

While the defendants have attempted to create several issues of fact regarding their right to sublease, the Court does not deem those inconsistencies material to the determination to be made by this Court. The issue presented is whether there exists an implied covenant of continuous operation in the lease.

## II.

### Summary Judgment Standards

A movant is entitled to summary judgment only if there are no material issues of fact and judgment is proper as a matter of law. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989). According to FED. R.CIV.P. 56(c),

> The Judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

The movant bears the burden of establishing the "absence of a genuine issue of material fact" as to an essential element of the nonmovant's case. *Barnhart v. Pickrel, Schaeffer and Ebeling Co.*, 12 F.3d 1382 (6th Cir. 1993). In this "new era of summary judgment", the Sixth Circuit has recently stated that trial courts have more discretion than ever in evaluation evidence presented in the record. *Id.* at 1389.

Plaintiffs' theory in this case is that the lease contains an implied covenant of continuous operation because such a provision is necessarily involved in the contractual relationship so that the parties must have intended it and only failed to express it because of shear inadvertence or because the provision was too obvious to need expression. Defendant, on the other hand, argues that no covenant of continuous operation existed in the lease and that the plain language of the lease precludes such a finding.

In Kentucky, contract interpretation generally is a matter for the court. *See e.g., Morganfield National Bank v. Damien Elder & Sons*, Ky., 836 S.W.2d 893 (1992). However, when construction of the contract requires reference to extrinsic evidence it can become a jury issue. *Cook United, Inc. v. Waits*, 512 S.W.2d 493 (Ky.1974). In the present case, the issue whether the lease agreement has an implied covenant of continuous operation does not appear to be proper for jury determination. The material facts are not disputed and the jury would be asked to determine the law given the facts. Such a calculus traditionally is not within the purview of the jury, but rather the courts.

When the underlying material facts are undisputed, contract construction is a question of law. Therefore, the Court must decide the issue of liability.

## III.

*Implied Covenant of Continuous Operation*

■ "An implied covenant is one which may be reasonable inferred from the whole agreement and circumstances attending its execution." *Anderson v. Britt,* 375 S.W.2d 258, 260 (Ky.1964). The courts have refused to prescribe a certain form for the construction of an implied covenant, instead looking to the true intentions of the parties. *Id.* Of course, the law does not favor implied covenants but this general rule does not mean that covenants may never by implied from written agreements. *Mercury Investment Company v. F.W. Woolworth Co.,* 706 P.2d 523, 530 (S.Ct.Okla.1985). A contract consists not only of the written agreements which the parties have expressed in words, but also obligations that are reasonably implied. *Id.* However, implied covenants can only arise where there is no express provision on the subject in the Agreement.[4] *Anderson,* 375 S.W.2d at 260.

The courts will declare implied covenants to exist only when there is a satisfactory basis in the express contract of the parties which makes it necessary to imply certain duties and obligations in order to effect the purposes of the parties to the contract made. Such covenants can be justified only upon ground of legal necessity arising from the terms of the contract or the substance thereof. The implication from the words must be such as will clearly authorize the inference or an imputation in law of the creation of a covenant. It is not enough to say that it is necessary to make the contract fair, that it ought to have contained a stipulation which is not found in it, or that without such covenant it would be improvident, unwise, or operate unjustly. The covenants raised by law from the use of particular words in an instrument are only intended to be opera-

tive when the parties themselves have omitted to insert the covenants. But when a party clearly indicated to what extent he intends to warrant or obligate himself, that is the limit of his covenant, and the law will not hold him beyond it. . . .

*Id.* at 261. It is paramount that the Court only implies a covenant when the agreement is not clear as to a specific term. After a review of the contract in question, this is not the type of situation where the parties expressly agreed that a long term lease, thirty years including the three five year options, would be available to the lessee regardless if they left the space unoccupied, did not assign to a suitable tenant, and continued to pay a base rent. Clearly, in that type situation, the Court would not impose an implied covenant of continuous operation.

■ To determine whether to imply a covenant of continuous operation, the courts look to the terms of the lease and the surrounding circumstances. Generally, the courts take several factors into account: (1) whether base rent is below market value, (2) whether percentage payments are substantial in relation to base rent, (3) whether the term of the lease is lengthy, (4) whether the tenant may sublet, (5) whether the tenant has rights to fixtures, and (6) whether the lease contains a noncompetitive provision. *See e.g., Slidell Investment Co. v. City Products Co.,* 202 So.2d 323 (La.App.1967); *Bastian v. Albertson's, Inc.,* 102 Idaho 909, 643 P.2d 1079 (App.1982); *Frederick Business Properties Co. v. Peoples Drug Stores, Inc.,* 191 W.Va. 235, 239, 445 S.E.2d 176, 180 (1994).

As noted by this Court in its Memorandum Opinion and Order that was set aside, application of the relevant interpretive factors from *Slidell Investment Co. v. City Products Co., supra,* to the lease in the case at hand mitigate towards a finding of an implied covenant of continuous operation.

■ First, shopping centers are designed for going concerns, not empty store fronts. Thus, when an entity in the business of operating a retail drug store negotiates a lease

---

4. "An express covenant on a given subject-matter excludes the possibility of an implied covenant of a different or contradictory nature." *Mercury*

*Investment Co. v. F.W. Woolworth Co.,* 706 P.2d 523, 531 (Okla.1985).

with a shopping center, absent a showing of unusual circumstances, it is implicit that the lessor intends to operate a store and that the lessor is leasing the space for that purpose. *See Piggly Wiggly Southern, Inc. v. Heard,* 197 Ga.App. 656, 399 S.E.2d 244, 247 (1991) (noting that a landlord of a shopping center would not want a vacant store in a shopping center even though the original tenant remained solvent and paid minimum monthly rent.)

Second, the fixed base rent alone provides the lessor no hedge against inflation. No landlord using good sound business judgment would burden his 6,300 square foot space in a shopping center for thirty years at base rent level without some hope of a satisfactory return on his commercial venture. Courts have found that where there is a showing of disparity between the fixed rent in the lease and the market value of the property, a covenant of continuous operation can be implied. *Stop & Shop, Inc. v. Ganem,* 347 Mass. 697, 200 N.E.2d 248, 251 (1964). Defendant argues that a material issue of fact exists as to this point claiming that the determinative factor as to market value is whether the base rent was at market value at the time the lease was executed in 1967 and not whether the base rent was at market value in 1991. *Worcester–Tatnuck Square CVS, Inc. v. Kaplan,* 33 Mass.App.Ct. 499, 601 N.E.2d 485, 488 (1992), *citing, Stop & Shop, supra.*

Plaintiffs have tendered the affidavit of Edward Pease, who states that the $1.79 rate was below market in 1966. In contrast, Defendant's expert, Malcom W. McKinnon, Jr., opines that the base rent was within market range for 1966. The Court does not see this dispute as a material issue of fact because it is not outcome determinative. Instead, it merely creates another factor to weighed by the Court. Mr. Pease's affidavit, supports a finding that the base rent was below market value at the time of execution. Moreover, both Pease and McKinnon agree that the base rent presently is well below market value.

The logical explanation is that percentage payments are intended as an integral part of the bargain to protect the lessor by creating a market driven guarantee of a fair return.

Percentage payments are the lessor's only hedge against inflation, and such payments are only possible when the lessee is operating on the premises. Thus, the lease's base-plus-percentage rent term is strong evidence in favor of a finding an implied covenant or continuous operation. *First American Bank & Trust Co. v. Safeway Stores, Inc.,* 151 Ariz. 584, 729 P.2d 938, 940 (App.1986).

Third, once SupeRx began operating profitably, percentage payments quickly became *substantial* in relation to base rent. From 1976 until 1990 percentage payments exceeded 40% of base rent. In many years overages exceeded base rent, peaking at approximately 150% of base in 1983. While the lease expressly states that percentage payments are not "rent," such semantic distinctions do not cloud the fact that percentage payments are a substantial part of the lessor's overall return on the lease. It was rent.

Fourth, while the limited sublease provision theoretically supports SupeRx's contention that the lease does not contemplate continuous operation by the lessee, the sublease term is so narrowly tailored that it implies that some suitable replacement business would occupy the leased space if not SupeRx. Thus, a more precise statement of the implied covenant is that the lessee, *or some suitable sublessee,* will continuously operate on the premises.

Defendants attempt to persuade the Court that their right to sublease was not narrowly tailored and that the landlord's willingness to include this provision negates a finding of an implied covenant. SupeRx was prohibited from subleasing to a food store, department store, variety store, skating rink, beer tavern, liquor store, discount store, or any other business which would conflict with the exclusive rights granted by the landlord in leases to other tenants. "The presence of a right to assign or sublet is not necessarily inconsistent with an implied covenant of continuous operation. The two covenants can be harmonized to permit subletting or assignment to a business of the same character." *First American Bank & Trust Co.,* 729 P.2d at 941. Obviously, the plaintiffs' predecessors

intended for a SupeRx, or another fitting business, to occupy these premises.

The plaintiffs' predecessor had a logical justification for including the clause regarding their right to approve the proposed sublessee. The landlord should feel certain he has a tenant that can generate revenues in excess of $564,300. At this point, the overages would become an important avenue for the landlord to recoup an adequate return on the lease. Otherwise, the tenant could lease the space to a business, such as a discount store, where no substantial revenue could ever be generated. An even better example would be if the tenant subleased to an office where no revenue is generated.

Fifth, SupeRx argues that the lessee's right to retain fixtures negates any implication of a covenant of continuous operation. While a term requiring accession of fixtures would present stronger evidence that the parties intended the lessee to continuously operate on the premises, the absence of such a term does not necessarily prove the converse. In the present case, the lease's fixtures provision appears to address the parties' relative property rights in the event of a sublease or the lease's expiration rather than to the issue of continuous operation.

Sixth, the existence of a noncompetition provision is a factor to consider by this Court. SupeRx was given the exclusive right to operate from the shopping center a full service drug store and the landlord committed not to lease space to a competitor within a radius of one and one-half miles of the Beaumont Plaza. This inures a benefit to SupeRx and in consideration for plaintiffs' predecessor entering into this agreement, the tenant impliedly agreed to keep to operate a particular type of business.

Finally, SupeRx's opening of a new store nearby Beaumont Plaza while simultaneously holding the Beaumont Plaza premises vacant smacks of bad faith. Even at substantially below market rates, the Beaumont Plaza lease is no bargain if not productively used unless SupeRx's motive is to deprive competitors of an auspicious, neighboring location. Such a design would be a restraint on trade. The Court will not permit an overly literal reading of the lease to allow SupeRx to achieve such an illegitimate end. Fairness in business dealing is of great importance to this Court. *See Piggly Wiggly Southern, Inc. v. Heard,* 197 Ga.App. 656, 399 S.E.2d 244, 247 (1991) (holding that it would be intolerable for tenant to refuse to sublease to keep out competition for the benefit of its other store.)

Defendant attempts to disclaim any implied covenant by referring to Paragraph 27 of the lease, "No obligation not stated herein shall be imposed by either party hereto." Armed with this provision, the Defendant claims that "an omission to specify an agreement in a written lease is evidence that there was no such understanding." *Stop & Shop, Inc. v. Ganem,* 347 Mass. 697, 200 N.E.2d 248, 251 (1964).

■■■■ The defendant must recognize, when dealing with "implied" covenants, such provision will never be written into an agreement and a failure to specify a provision is not necessarily "evidence that there was no such understanding". The courts look to the terms and circumstances of the parties agreement to see if the law must necessarily imply a provision to effectuate the true intent of the agreement. Under such circumstances, an oblique reference to the situation, like Paragraph 27, is not always given full force and effect. For example, in every contract, there is an implied covenant of good faith and fair dealing to impose on the parties "a duty to do everything necessary to carry out" the intent of the contract. *Ranier v. Mount Sterling National Bank,* 812 S.W.2d 154, 156 (Ky.1991). Likewise, when a contract contains a clause disclaiming implied warranties, the law requires that the clause be "conspicuous" so as to draw the readers attention to the clause. *Massey–Ferguson v. Utley,* 439 S.W.2d 57, 58 (Ky.1969). Such exclusionary language disclaiming implied warranties in a contract will not always be upheld by the Court.

In sum, the implication of a covenant of continuous operation is necessary to a rational understanding of the lease in light of the surrounding circumstances. Without an implied covenant of continuous occupation by the lessee or a suitable sublessee the entire

agreement is nonsensical. The implied covenant of continuous operation is necessary to effectuate the true intentions of these parties. Accordingly, the Court must imply such a covenant. Since SupeRx ceased operations at the Center without subleasing to a suitable business as defined by the lease, as a matter of law, SupeRx is in breach of the lease. If SupeRx was unable to make a profit at the Beaumont Plaza, felt that a different location would improve their economic well-being, and could not find a sublessee meeting with the landlord's approval, SupeRx should have offered to surrender up their lease to plaintiffs. To hold the premises in order to keep out competition for their other location is completely unacceptable.

SupeRx argues that it has made good faith efforts to sublet the premises, but good faith attempts to comply with a contract is no defense to breach. Additionally, SupeRx relies on dicta from a previous unpublished opinion of this Court for the proposition that unprofitability is an excuse for breach of an implied covenant of continuous operation. The Court recognizes the possibility that a lessee with a base-plus-percentage lease might efficiently breach an implied covenant of continuous occupation in the event of unprofitability.

In the present case, during the period that the Beaumont Plaza lacked an anchor grocery store, SupeRx's breach may very well have been without damages to Plaintiffs. On the other hand, from the time the new anchor store opened and SupeRx did not re-open, Plaintiffs may have a substantial damages claim. These questions are for a jury. In sum, in a base-plus-percentage lease with an implied covenant of continuous operation, in the event of unprofitability, lessee's breach may be a good business decision, but the lessor may nevertheless then seek other available remedies such as cancellation of the lease even if damages are not owing.

In *Bastian v. Albertson's Inc.*, the court reached the same result implying a covenant of "certain rental" or that "the lessee would pay a reasonable and adequate rent ... during the time lessee chose not to operate ... on the premises." 643 P.2d at 1082, 1085.

The *Bastian* covenant is simply a subspecies of a covenant of continuous operation.

## IV.

### *Conclusion*

On the declaratory judgment count, the Court will enter judgment declaring Plaintiffs have the right to cancel the lease agreement and reoccupy the premises. SupeRx has materially breached the lease, and by the lease's terms Plaintiffs are entitled to reoccupy the premises.

The issue of monetary damages is for the jury. The proper measure of damages is the fair rental value of the premises during the time of breach. *See Bastian*, 643 P.2d at 1085. Fair market value is a factual question for the jury that may hinge on the SupeRx's reasonable expectation of operating a profitable business both with and without an anchor grocery at Beaumont Plaza. Accordingly,

The Court hereby **ORDERS, ADJUDGES, AND DECLARES:**

(1) that the lease agreement contains an implied covenant of continuous operation by the lessee or a suitable sublessee,

(2) that Defendant has materially breached the implied covenant by failing to continuously operate or obtain a suitable sublessee,

(3) that Plaintiffs may cancel the lease with Defendant and reoccupy the premises,

(4) that Defendant's motion for summary judgment, (D.E. # 36) is **OVERRULED,**

(5) that Plaintiffs' motion to file a responsive memorandum, (D.E. # 38), is **SUSTAINED,**

(6) that Plaintiffs' motion for summary judgment, (D.E. # 47) is **SUSTAINED;**

(7) that summary judgment on the issue of liability is **GRANTED** in favor of Plaintiffs,

(8) that the only remaining issue for trial is the issue of monetary damages, and for

this reason, this order shall be considered final.