2002 OK 93

**SOUTHERN CORRECTIONS SYSTEMS, INC., Plaintiff/Appellant,**

v.

**UNION CITY PUBLIC SCHOOLS, Oklahoma Independent School District No. 57, Joe Wall, an individual, Mike Dawson, an individual, Patsy Alexander, an individual, and Dale Debord, an individual, Defendants/Appellees.**

**No. 97,890.**

Supreme Court of Oklahoma.

Nov. 26, 2002.

1084

Thomas J. Daniel IV, Eric Gray, Oklahoma City, OK, for Plaintiff/Appellant.

Frederick J. Hegenbart, Tulsa, OK, for Defendants/Appellees.

KAUGER, J.

¶ 1 This cause concerns Union City Public School District's contract with Southern Correctional Systems, Inc., to provide educational services to a juvenile correctional facility. The agreement provided for the facility's costs to be reduced by an amount equal to the funds the school district received from State aid which was attributable to the children residing at the facility.[1] The determinative issue presented is whether the Okla. Const. art. 10, § 26[2] which prohibits school districts from using income from one fiscal year to pay obligations incurred in another fiscal year, precludes the school district from making payments pursuant to the contract. We hold that, under the facts presented, the school district's obligation is not a "debt" for purposes of the constitutional debt limitation pursuant to the Okla. Const. art. 10, § 26.

## FACTS

¶ 2 In 1998, the appellant, Southern Corrections Systems, Inc. (Southern/SCS) constructed an eighty bed medium security residential treatment center for juveniles (juvenile facility) in Union City, Oklahoma. On July 15, 1998, Southern contracted with the Union City Public School District (school district) to provide education to the children who lived at the juvenile facility.[3]

1. Although the contract at issue refers to State and/or Federal aid, see note 3, infra, the arguments focus only on State aid and the record does not provide any additional information regarding possible Federal aid. Consequently, references are to State aid only.

2. The Okla. Const. art. 10, § 26 provides in pertinent part:
"(a) Except as herein otherwise provided, no county, city, town, township, school district, or other political corporation, or subdivision of the state, shall be allowed to become indebted, in any manner, or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year without the assent of three-fifths of the voters thereof, voting at an election, to be held for that purpose, nor, in cases requiring such assent, shall any

indebtedness be allowed to be incurred to an amount, including existing indebtedness, in the aggregate exceeding five percent (5%) of the valuation of the taxable property therein, to be ascertained from the last assessment for state and county purposes previous to the incurring of such indebtedness...."

3. Article 1(1) of the contract provides in pertinent part:
"The District will provide a secondary educational program at the Center that will be recognized as an 'alternative education' program...."
Article 8 of the contract provides in pertinent part:
"... The amount owed by SCS to the District during the term of this Agreement shall be reduced by the sum of all funds the District

The school district operates on a fiscal year which runs from July 1st to June 30th, and it refers to a fiscal year as a "school year." The contract, which was effective for the 1998–1999 school year, required Southern to provide the facilities and equipment necessary to educate the children and to pay the school district for the costs of providing education.[4]

¶ 3 Although Southern was required to pay the school district for educational costs, the contract also provided for the costs to be reduced by the amount equal to any funds which the school district received, or became eligible to receive, from any State aid during the term of the contract which was attributable to the children residing within the school district's boundaries.[5] The juvenile facility opened in February of 1999, and the school district provided educational services for the remainder of the 1998–1999 school year.

¶ 4 Southern paid the school district $238,323.31 for the 1998–1999 school year. However, it is undisputed that state educational funding is based on a periodic census of the number of students in attendance in the school district and adjusted based on a variety of factors.[6] A census is taken in May of each year, and it is used to determine aid for the following year. In October, another census is made to determine if an adjustment in aid should be made in January. Consequently, no aid was actually received by the school district during the 1998–1999 school year attributable to the children residing at the juvenile facility until the following school year.[7]

receives or becomes eligible to receive during the term of this contract as State and/or Federal aid, textbook allocations, School Lunch Program reimbursements or any other allocations or reimbursements generated by the presence within the District's boundaries of those children residing at the Center. The sum of aid funds described above shall be the amount to which the District is entitled as determined by the State Department of Education, Finance Division. It shall be the responsibility of the District to actively pursue any and all outside additional funding available for the operation of the Center educational program, including State Aid, textbook allocations, and School Lunch Program allocations...." (Emphasis Supplied.)

4. Article 4 of the contract provides in pertinent part:

"SCS shall furnish and maintain classrooms and educational equipment, including computers, recreational and vocational equipment, as requested by the District and as agreed upon by SCS, for use in the Center educational program...."

Article 8 of the contract provides in pertinent part:

"It is agreed that SCS will pay the District for salaries, [c]osts and expenses set forth on Exhibit 'A'...."

5. Article 8 of the contract, see note 3, supra.

6. Title 70 O.S.2001 § 18–200.1 provides in pertinent part:

"A. Beginning with the 1997–98 school year, and each school year thereafter, each school district shall have its initial allocation of State Aid calculated based on the state dedicated revenues actually collected during the preceding fiscal year, the adjusted assessed valuation of the preceding year and the highest weighted average daily membership for the school district of the two (2) preceding years. The State Department of Education shall notify each school district by July 15 of the districts initial allocation level. Each school district shall submit the following data based on the first nine (9) weeks, to be used in the calculation of the average daily membership of the school district:

1. Student enrollment by grade level;
2. Pupil category counts; and
3. Transportation supplement data.

On or before December 30, the State Department of Education shall determine each school district's current year allocation pursuant to subsection D of this section. The State Department of Education shall complete an audit, using procedures established by the Department, of the student enrollment by grade level data, pupil category counts and transportation supplement data to be used in the State Aid Formula pursuant to subsection D of this section by December 1 and by January 15 shall notify each school district of the district's final State Aid allocation for the current school year. The January payment of State Aid and each subsequent payment for the remainder of the school year shall be based on the final State Aid allocation as calculated in subsection D of this section...."

Because the pertinent portions of the statute remain unchanged since its last amendment, references are to the current version of the statute. See also, 70 O.S.2001 § 18–201.1 for the calculations of State aid formulas and weighted memberships.

7. There is no documentation in the record from the State Department of Education explaining the particulars of the census procedures it uti-

¶5 Another contract was negotiated for the 1999–2000 school year. Because the school district received aid during the 1999–2000 school year, it reimbursed Southern by an agreed amount. In January of 2000, the school district informed Southern that it did not wish to contract for the 2000–2001 school year. However, it is undisputed that the school district received State aid for the 2000–2001 school year attributable to the children residing at the juvenile facility.

¶6 Initially, Southern had trouble finding another school system to provide education for the children. The State Department of Education informed the school district that it would be required to provide education to the children at the juvenile facility if Southern could not reach an agreement with another school system. Ultimately, Southern contracted with the Butler Public School District for the 2000–2001 school year, and it sought reimbursement from the Union City School District for the $238,323.31 it had spent during the 1998–1999 school year.

¶7 In April of 2000, the Union City school board voted to pay Southern $238,323.31, contingent upon the receipt of State aid and court approval. Subsequently, the attorney for the school district determined that the school district was constitutionally prohibited from making such a payment. On July 31, 2000, Southern filed a lawsuit against the school district as well as the individual school board members. Southern sought a declaratory judgment to recover $238,323.31, asserting claims of unjust enrichment, breach of contract, and breach of a settlement agreement. Southern later amended its petition to include claims for specific performance and recovery of funds which the school district received attributable to the school's lunch program.

¶8 The school district filed an answer, raising numerous affirmative defenses and counterclaims for breach of contract and declaratory judgment. On February 4, 2002, the school district moved for summary judgment. It argued that pursuant to the terms of the contract, it had met its financial obligations and even if it had not, requiring the school district to pay the $238,323.31 to Southern would create an illegal financial obligation for more than one fiscal year. On February 6, 2002, Southern moved for summary judgment asserting that it had a settlement agreement with the school district, and requesting that the court direct the school district to present a joint application and an agreed journal entry of judgment directing the district to make the payment.

¶9 The trial court heard the matter on April 12, 2002. On May 24, 2002, it entered an order granting summary judgment in favor of the school district and the individual school board members on all of the claims relating to the $238,323.31. The trial court determined that because it would be unconstitutional for the school district to reimburse Southern the $238,323.31, the school district had no legally enforceable obligation to pay it. It also granted partial summary judgment for Southern on the school district's counterclaim, with the exception of $6,973.15. On June 24, 2002, Southern appealed and filed a motion to retain the cause in this Court. We granted the motion to retain on August 1, 2002.

¶10 **UNDER THE FACTS PRESENTED, THE SCHOOL DISTRICT'S OBLIGATION IS NOT A "DEBT" FOR PURPOSES OF THE CONSTITUTIONAL DEBT LIMITATION PURSUANT TO THE OKLA. CONST. ART.10, § 26.**

a. **State aid and the school district's obligation under the contract.**

¶11 The school district concedes that it cannot lawfully enter into a contract which obligates it to exceed the budgetary limitations of a fiscal year.[8] Relying on the language of the contract, the school district asserts that it was not required to reimburse

lizes in May and October. Nevertheless, both parties agree that the censuses are taken in May and October of each year and that the school district did not actually receive any State aid during the 1998–1999 school year which was

attributable to the children residing at the juvenile facility.

8. See discussion and corresponding footnotes, pages 1089–1091, infra.

Southern for the 1998–1999 school year because it did not actually receive any aid that year. Southern contends that, pursuant to the contract, the school district was obligated to reimburse it because its *eligibility to receive State aid was determined during the 1998–1999 contract,* even though it was not received until the next school year.

¶ 12 Southern also insists that it reached a settlement agreement with the school district regarding the payment of the $238,323.31 and that it is entitled to payment regardless of whether the underlying debt is constitutional. The school district argues that a settlement agreement was never reached. It also contends that it would be unlawful for it to pay a settlement if the underlying debt were unconstitutional. Even if a settlement agreement were reached,[9] resolution of this cause depends upon the original contract because unconstitutional contractual obligations could not be subsequently validated by settlement of the contractual dispute.[10]

¶ 13 The 1998–1999 contract provides in pertinent part:

9. The attorney for the school district sent Southern a letter dated June 22, 2000, which expressed the desire of the school district to settle Southern's claim if it could be done legally. The letter states that in order to settle: 1) documents would have to be obtained from the State Department of Education showing that the School is getting state aid for the students; 2) a court would have to enter a journal entry of judgment against the school district; and 3) the judgment would have to be placed on the judgment roll, increasing ad valorem taxes and paid out over three years with interest. Southern asserts that it reached a settlement agreement with the school district and that it is entitled to payment regardless of the constitutionality of the underlying debt. It relies on *Warburton v. Tacoma School District No. 10,* 55 Wash.2d 746, 350 P.2d 161 (1960) in support of its argument. The school district asserts that no settlement agreement was actually made because an agreement was never reduced to writing as required by 70 O.S.2001 § 5–123. Section 5–123 provides:

"No expenditure involving an amount greater than Five Hundred Dollars ($500.00) shall be made by a board of education except in accordance with the provisions of a written contract or purchase order."

We note that *Warburton v. Tacoma School District No. 10,* supra, did not involve a discussion of a constitutional debt limitation like Oklahoma's.

10. See, *Del City v. FOP, Lodge No. 114,* 1993 OK 169, ¶ 5, 869 P.2d 309 [Legislature cannot relieve

"... The amount owed by SCS to the District during the term of this Agreement shall be reduced by the sum of all funds the District **receives or becomes eligible to receive during the term of this contract** as State and/or Federal aid, textbook allocations, School Lunch Program reimbursements or any other allocations or reimbursements generated by the presence within the District's boundaries of those children residing at the Center. The sum of aid funds described above shall be the amount to which the District is entitled as determined by the State Department of Education, Finance Division...." (Emphasis supplied.)

¶ 14 If the terms of a contract are unambiguous, clear and consistent, they are accepted in their plain and ordinary sense and the contract will be enforced to carry out the intention of the parties as it existed at the time it was negotiated.[11] The interpretation of a contract, and whether it is ambiguous is a matter of law for the Court to resolve.[12] Contractual intent is determined

city burden of following confines of constitutional debt limitation.]; *Wyatt–Doyle & Butler Engineers, Inc. v. City of Eufaula,* 2000 OK 74, ¶ 12, 13 P.3d 474 [Invalid contract cannot be subsequently validated by the voters or a municipality.]; *Le Flore County Excise Bd. v. St. Louis–San Francisco Ry. Co.* 1939 OK 306, ¶ 15, 93 P.2d 1087 [Judgment for services in excess of appropriations was invalid.]; *Chicago, R.I. & P. Ry. Co. v. Excise Board of Garfield County,* 1934 OK 117, ¶ 13, 30 P.2d 171 [Judgment cannot be recovered on contractual obligation if indebtedness sued upon was a contract in violation of debt limitations.]; *In re Protest of Chicago, R.I. & P. Ry. Co.* 1930 OK 285, ¶¶ 4–5, 289 P. 258 [Judgment pursuant to claim which was contracted in violation of debt limitation is void.]; *In re Town of Afton,* 1914 OK 537, ¶¶ 3–5, 144 P. 184 [Warrants issued as evidence of indebtedness could not be ratified by voters, nor by decree of the court.].

11. *K & K Food Services, Inc. v. S & H, Inc.,* 2000 OK 31, ¶ 7, 3 P.3d 705; *Osprey L.L.C. v. Kelly–Moore Paint Co.,* 1999 OK 50, ¶ 13, 984 P.2d 194; *Dodson v. St. Paul Ins. Co.,* 1991 OK 24, ¶ 12, 812 P.2d 372.

12. *K & K Food Services, Inc. v. S & H, Inc.,* see note 11, supra; *Osprey L.L.C. v. Kelly–Moore Paint Co.,* see note 11, supra; *Prudential Ins. Co. of America v. Glass,* 1998 OK 52, ¶ 19, 959 P.2d 586. A contract term is ambiguous only if it can

from the entire agreement.[13] If a contract is complete in itself and viewed in its entirety is unambiguous, its language is the only legitimate evidence of what the parties intended.[14] The Court will not create an ambiguity by using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on the provision.[15]

¶ 15 Applying these general principles, we hold that the obvious purpose of the contract was to outline the specific terms by which the school district was to provide education for the children at the juvenile facility.[16] The provision in contest unambiguously required the school district to reimburse Southern by an amount equal to any State aid that it either received or became eligible to receive during the 1998–1999 contract which was attributable to the children living within the school district's boundaries. Clearly, the parties contemplated and intended that the school district would not recoup a double

payment from Southern and from the State for the educational services it provided.

¶ 16 Funding for public education through State aid is appropriated by the Legislature and administered by the State Board of Education.[17] State aid is calculated based in part on the average daily attendance of the school district of the two preceding school years.[18] It is undisputed that a school district receives State aid in one year which is attributable to children who resided in the district in the previous year.

¶ 17 Pursuant to statute, the school district did not receive any aid attributable to the children living at the juvenile facility during the 1998–1999 school year. Eligibility for State aid attributable to those children was based and calculated on attendance in the 1998–1999 school year. Under the terms of the contract, the school district was obligated to reimburse Southern in an amount equal to the State aid, if any, which was attributable

be interpreted as having two different meanings. *K & K Food Services, Inc. v. S & H, Inc.,* supra at ¶ 8; *Osprey L.L.C. v. Kelly–Moore Paint Co.,* supra; *Littlefield v. State Farm Fire & Casualty Co.,* 1993 OK 102, ¶ 7, 857 P.2d 65.

**13.** *Buck's Sporting Goods, Inc. of Tulsa v. First National Bank & Trust Co. of Tulsa,* 1994 OK 14, ¶ 12, 868 P.2d 693; *Mercury Inv. Co. v. F.W. Woolworth Co.,* 1985 OK 38, ¶ 9, 706 P.2d 523.

**14.** *Founders Bank & Trust Co. v. Upsher,* 1992 OK 35, ¶ 11, 830 P.2d 1355; *Mercury Inv. Co. v. F.W. Woolworth Co.,* see note 13, supra.

**15.** *Osprey L.L.C. v. Kelly–Moore Paint Co.,* see note 11, supra; *Wynn v. Avemco Ins. Co.,* 1998 OK 75, ¶ 17, 963 P.2d 572; *Pierce Couch, Hendrickson, Baysinger & Green v. Freede,* 1997 OK 33, ¶ 21, 936 P.2d 906.

**16.** Article 1(1) of the contract, see note 3, supra; Article 4 of the contract, see note 4, supra.

**17.** The Okla. Const. art 13, § 1a provides in pertinent part:
"The Legislature shall, by appropriate legislation raise and appropriate funds for the annual support of the common schools of the State to the extent of forty-two ($42.00) dollars per capita based on total state-wide enrollment for the preceding school year. Such moneys shall be allocated to the various school districts in the manner and by a distributing agency to be designated by the Legislature ..."
Title 70 O.S.2001 § 18–103 provides in pertinent part:

"There shall be apportioned and disbursed annually by the State Board of Education, from appropriations made by the Legislature for this purpose and from funds derived from other sources provided by law for this purpose, to the several school districts of the state, such sums of money as each school district may be qualified to receive under the provisions of this article...."
See also, 70 O.S.2001 § 18–101 et seq. Public education relies primarily on two sources of revenue for funding—local and state sources. See, Op. Atty. Gen., 1999 OK AG 36, ¶ 3, for a discussion of local and state funding for public schools. Local funding is obtained by counties levying ad valorem taxes on taxable property within the school district for school purposes. The proceeds of this levy are apportioned among the county school districts based upon the legal average daily attendance for the preceding school year. The Okla. Const. art. 10, § 9(b) provides in pertinent part:
"A tax of four (4) mills on the dollar valuation of all taxable property in the county shall be levied annually in each county of the State for school purposes and, until otherwise provided by law, the proceeds thereof shall be apportioned to the school districts of the county by the County Treasurer on the basis of the legal average daily attendance for the preceding school year as certified by the State Board of Education...."
See also, Okla. Const. art 10, § 10 relating to building funds for school districts.

**18.** Title 70 O.S.2001 § 18–200.1, see note 6, supra.

to the children who resided at the juvenile facility during the 1998–1999 school year even though the funds were not actually received during that school year.

### b. The constitutional debt limitation and its application to the school district's obligation.

■ ¶ 18 The school district also concedes that it is willing to resolve this dispute by paying Southern the money it sought—if it is lawful to make such a payment. However, it argues that it would be unconstitutional for it to pay Southern from funds which it did not receive during the year in which the contract was effective. Southern contends that it is not.

¶ 19 Article 1, § 5 of the Oklahoma Constitution provides for the establishment and maintenance of a system of public schools within the State.[19] Article 13, § 1 of the Constitution places the obligation of establishing and maintaining a free public school system on the Legislature.[20] Funding for mandated education is constitutionally and statutorily allocated based on the number of children attending school within a district for the preceding year.[21] School districts are required to provide educational services to children who reside in a juvenile treatment facility.[22]

■ ¶ 20 Article 10, § 26 of the Oklahoma Constitution prohibits school districts from becoming indebted, in any manner, or for any purpose, by an amount exceeding the income and revenue provided for a fiscal year without the assent of three fifths of the voters.[23] This constitutional provision forces

19. The Okla. Const. art. 1 § 5 provides:
"Provisions shall be made for the establishment and maintenance of a system of public schools, which shall be open to all the children of the state and free from sectarian control; and said schools shall always be conducted in English: Provided, that nothing herein shall preclude the teaching of other languages in said public schools."

20. The Okla. Const. art. 13, § 1 provides:
"The Legislature shall establish and maintain a system of free public schools wherein all the children of the State may be educated."

21. The Okla. Const. art 13, § 1a, see note 17, supra; Okla. Const. art. 10, § 9(b), see note 17, supra; 70 O.S.2001 § 18–200.1, see note 6, supra; 70 O.S.2001 § 18–201.1.

22. Title 70 O.S.2001 § 1–113 provides in pertinent part:
"... D. When a child does not meet the criteria for residency provided in subsection A of this section and is placed in any of the following entities which is out of the child's home and not in the school district in which the child legally resides: a residential facility, a treatment program or center, including the facility operated pursuant to Section 485.1 of Title 63 of the Oklahoma Statutes ... the entity shall, if the child contends he or she resides in a school district other than the district where the entity is located, within seven (7) days of admittance, notify the school district in which the entity is located of the admittance.
Upon provision of educational services to such children pursuant to the provisions of subsection F of this section, the receiving district shall receive the State Aid as defined in subsection C of Section 18–110 of this title for those students.

...
F.1. The school district in which an entity as described in subsection D of this section exists to serve children in out-of-home placements shall, upon request of the individual or agency operating the entity, provide the educational services to which the children in the entity are entitled subject to the limitations provided in subsection C of this section. No person operating such an entity may contract for the provision of educational services with any school district other than the school district in which the entity is located unless the school district in which the entity is located agrees in writing to allow another school district to provide the educational services.
...
3... No school district shall be responsible for any expenses for students in an entity described in subsection D of this section which are not directly related to the provision of educational services. A school district shall not be obligated for expenses of those students in an entity in the current school year for whom educational services are requested after the district's first nine (9) weeks of the current school year if educational services are requested for twelve or more students than were served in the first nine (9) weeks, unless the school district chooses to provide educational services for the current school year. Contracts and agreements for the provision of educational services may allow for the use of public and private sources of support which are available to share the costs of education services and of therapies, treatments, or support services...."

23. The Okla. Const. art. 10, § 26, see note 2, supra. Contracts, executed or executory which seek to bind a school district's revenues of a succeeding fiscal year are void. *Independent*

school districts to operate on a cash basis, and it prevents indebtedness payable out of tax revenues from extending beyond one year.[24] This section serves not only as a restriction on the school district, but also on the Legislature.[25]

¶ 21 Southern relies on *Willow Wind, Inc. v. City of Midwest City,* 1989 OK 171, 790 P.2d 1067, and we agree that it is instructive. In *Willow Wind,* this Court addressed a type of debt which would not violate the constitutional debt limitations of § 26.[26] *Willow Wind,* involved a city which enacted ordinances that provided for a method by which private developers could construct water and sewer lines, dedicate them to the city, and receive back a portion of the cost of construction over the next fifteen years. Pursuant to the ordinances, the city reimbursed the developers from assessments collected from subsequent developers who benefitted from the facilities for fifteen years or until the developer recouped ninety percent of the costs, whichever occurred sooner. The city withheld an administrative fee of ten percent.

¶ 22 Four years after the ordinances were enacted, the city repealed them on the ground that they were unconstitutional. In addressing the constitutionality of the arrangement, the Court recognized that: 1) a debt is a promise to pay a certain amount, with interest, within a fixed time, out of taxes taken from all of the people, including those not benefitted; and 2) a city creates an indebtedness when it borrows money to be paid, with interest, from taxes in the future, whether such taxes are formally levied at one time, covering that future, or yearly, to meet the payments when about to mature.[27] The Court determined that the city's obligation under the ordinances was to reimburse ninety percent of any amount it might collect. The period of collection was limited to fifteen years, whether any funds were collected, and there was no certain amount owed by the city.

¶ 23 Although the arrangement was a debt in the sense of an obligation, the Court held that the ordinance did not constitute deficit financing for purposes of the constitutional debt limitations because the ordinance provided: no promise to pay a certain amount; the amount to be paid was taken from those who directly benefitted from the water and sewer lines; and there was no guarantee that the developers would be paid anything.[28] Here, Southern advanced the costs of providing education to the children to the school district, until the school district received funding which was specifically attributable to the children. Under the terms of the contract, the school district was not obligated to repay Southern a specific amount.[29] Rather, reductions from what Southern owed corresponded only to the State aid received, if any, from children living at the juvenile facility.[30]

¶ 24 Nothing in the agreement obligated the school district if the State determined that none of the allocations available were attributable to the children living at the facil-

---

*School District No. 1 v. Howard,* 1959 OK 17, ¶ 7, 336 P.2d 1097; *Consolidated School Dist. No. 6 v. Panther Oil & Grease Mfg. Co.,* 1946 OK 137, ¶ 4, 168 P.2d 613; *Board of Education of School Dist. No. 47½ v. Jacobs,* 1928 OK 677, ¶ 7, 272 P. 360.

24. *Wyatt–Doyle & Butler Engineers, Inc. v. City of Eufaula,* see note 10, at ¶ 6, supra; *Del City v. FOP, Lodge No. 114,* see note 10, supra; *Independent School District No. 1 v. Howard,* see note 23, supra.

25. *Wyatt–Doyle & Butler Engineers, Inc. v. City of Eufaula,* see note 10, supra; *Protest of Carter Oil Co.,* 1931 OK 15, ¶ 16, 296 P. 485; *St. Louis–San Francisco Ry. Co. v. Andrews,* 1928 OK 250, ¶ 0, 137 Okla. 222, 278 P. 617.

26. The Okla. Const. art. 10, § 26, see note 2, supra.

27. *Willow Wind, Inc. v. City of Midwest City,* 1989 OK 171, ¶ 9, 790 P.2d 1067, discussing *City of Lawton v. Morford,* 1930 OK 531, 293 P. 1068, overruled in part by *Wilson v. City of Hollis,* 1943 OK 344, 142 P.2d 633.

28. See also, *City of Wewoka v. Billingsley,* 1958 OK 247, 331 P.2d 949 in which the Court held that a contract which obligated subdividers to build and lease water lines in return for a city's promise to deliver to subdividers one-half of all revenue collected for water supplied through lines did not create a debt within the constitutional limitations.

29. Article 8 of the contract, see note 3, supra.

30. *Id.*

ity, or if the State were unable to make allocations because of budgetary shortfalls. Nor does the agreement attempt to bind the State from making appropriation decisions.[31] Under the unique facts presented, and the particular way in which the obligation at issue here was incurred, we view this cause as one which is similar to the type of obligation involved in *Willow Wind.*

¶ 25 We are not persuaded that the obligation imposed by this type of arrangement is within the purview of those which are precluded by § 26[32] because, like the obligation involved in *Willow Wind,* there was no deficit financing.[33] The contract merely precluded the school district from obtaining a double recovery from Southern and the State. Additionally, if this type of arrangement violated the constitutional debt limitations, numerous school board members across the State could be held personally liable for agreeing to similar contracts.[34] Consequently, we hold that, under the facts presented, the school district's obligation is not a "debt" for purposes of the constitutional debt limitation pursuant to the Okla. Const. art. 10, § 26.

## CONCLUSION

 ¶ 26 Summary judgment is proper only when the pleadings, affidavits, depositions, admissions or other evidentiary material establish that there is no genuine issue as

---

**31.** Similarly, in *In the Matter of Oklahoma Capitol Improvement Authority,* 1998 OK 25, ¶ 49, 958 P.2d 759, *cert denied, Fent v. Oklahoma Capitol Improvement Authority,* 525 U.S. 874, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998) the Court recognized that bond arrangements which do not bind future legislatures from making independent decisions with regard to anticipated appropriations to retire the bonds are not debts for purposes of the constitutional debt limitations.

**32.** The Okla. Const. art. 10, § 26, see note 2, supra. In *Del City v. FOP, Lodge No.* 114, see note 10, supra, this Court reviewed and analyzed prior decisions involving Article 10, § 26. Although we need not exhaustively list every case, § 26 has been applied to deny payment for employment, services and/or materials, and statutory declared continuations of bargaining agreements. See, *Del City v. FOP, Lodge No. 114,* supra [bargaining agreements]; *Baylis v. City of Tulsa,* 1989 OK 90, ¶ 10, 780 P.2d 686 [police officer/fire fighters]; *Independent School Dist. No. 1 v. Howard,* see note 23, supra [purchase of typewriter]; *Consolidated School Dist. No. 6 v. Panther Oil & Grease Mfg. Co.,* see note 23, supra [merchandise sold]; *Jurd v. City of Tulsa,* 1938 OK 345, ¶ 8, 80 P.2d 596 [fireman]; *Protest of Carter Oil Co.,* see note 2 at ¶ 29, supra [transport children to school]; *Board of Commissioners v. Robinson,* 1929 OK 427, ¶ 9, 282 P. 299 [county superintendent]; *Board of Education v. McAchran,* 1928 OK 414, ¶ 3, 271 P. 843 [teacher's salary]; *Board of Education of School Dist. 47 ½ v. Jacobs,* see note 23, supra [attorney fees].

**33.** The school district argues that *Willow Wind, Inc. v. City of Midwest City,* see note 27, supra, is distinguishable from the present case because: 1) the contract was limited to government aid received during the term of the contract; 2) there is no question that the school district will not receive any aid, the only uncertainty is the exact dollar amount; and 3) the fund from which Southern seeks payment come from the school

district's total revenue package of aid which the school district receives to fund its operations. Although the facts of this cause and *Willow Wind* are not exactly identical, the school district's arguments do not preclude its application. The school district ignores the phrase "becomes eligible to receive" in the contract; and the fact that the funds Southern seeks, even though they come from the State, are directly tied only to the children which the school district was previously paid to provide education.

**34.** School district board of education members can be held liable for exceeding the budgetary limitations of a fiscal year. Title 62 O.S.2001 § 479 provides in pertinent part:

"A. It shall be unlawful for the ... school district board of education ... to willfully or knowingly make any contract for, incur, acknowledge, approve, allow or authorize any indebtedness against their respective ... school district or authorize it to be done by others, in excess of the estimate made and approved by the excise board for such purpose for the current fiscal year, or in excess of the specific amount authorized for such purpose by a bond issue.
B. Any such indebtedness, contracted, incurred, acknowledged, approved, allowed or authorized in excess of the estimate made and approved for such purposes for the current fiscal year or in excess of the specific amount authorized for such purpose by a bond issue, shall not be a charge against the municipality, county or school district whose officer or officers contracted, incurred, acknowledged, approved, allowed or authorized or attested the evidence of said indebtedness, but may be collected by civil action from any official willfully or knowingly, contracting, incurring, acknowledging, approving or authorizing or attesting to the indebtedness, or from the bondsmen of the official."

to any material fact, and that the moving party is entitled to a judgment as a matter of law.[35] Here, the trial court granted summary judgment to the school district because it determined that it would be unconstitutional for the school district to reimburse Southern. However, we have determined that, under the facts presented, the school district's obligation is not a "debt" for purposes of the constitutional debt limitation pursuant to the Okla. Const. art. 10, § 26. Accordingly, the trial court erred in granting summary judgment to the school district.

**REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS PRONOUNCEMENT.**

WATT, V.C.J., HODGES, OPALA, SUMMERS, BOUDREAU, WINCHESTER, JJ., concur.

LAVENDER, J., concurs in result.

---

**35.** *Skinner v. Braum's Ice Cream Store,* 1995 OK 11, ¶ 9, 890 P.2d 922; *Buck's Sporting Goods,* *Inc., of Tulsa v. First Nat. Bank & Trust Co. of Tulsa,* see note 13, supra.